**DELTA AIRLINES, Atlantic Coast Airlines, Globe Security Services, Inc., Appellants and Cross–Appellees,**

v.

**Bryan L. COOK and Jennifer L. Cook, Appellees and Cross–Appellants.**

No. 49A02–0401–CV–77.

Court of Appeals of Indiana.

Oct. 19, 2004.

**450**

Bruce L. Kamplain, Joseph P. Maguire, Norris Choplin and Schroeder, Indianapolis, IN, Attorneys for Appellant.

Bryan L. Cook, Jennifer L. Cook, Indianapolis, IN, pro se.

John D. Papageorge, Sommer Barnard Ackerson, Indianapolis, IN, Attorney for Cross–Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Bryan Cook and Jennifer Cook filed a complaint against Atlantic Coast Airlines ("ACA"), Delta Airlines ("Delta"), and Globe Security Services, Inc. ("Globe")[1] (collectively "the Defendants"), alleging negligent infliction of emotional distress and breach of contract. ACA appeals the trial court's partial denial of its motion for summary judgment and presents the following issues for our review:

1. Whether the Cooks' claims are preempted by federal law.

2. Whether the trial court erred when it concluded that the Cooks have stated a claim upon which relief can be granted.

3. Whether the trial court erred when it concluded that the Cooks' appeal of the Small Claims Court's decision was timely.

---

1. Globe is not a party to either ACA's appeal    or the Cooks' cross-appeal.

4. Whether the trial court abused its discretion when it granted the Cooks' motion to compel discovery.

The Cooks cross-appeal and present the following issues for our review:

1. Whether the trial court erred when it concluded that neither Delta nor ACA breached their contracts with the Cooks.

2. Whether the trial court erred when it entered summary judgment in favor of Delta on the Cooks' negligence claims.

We affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

On February 8, 2002, the Cooks arrived at the Indianapolis International Airport and proceeded to the designated gate for Delta flight number 6116, which was a direct flight to New York City operated by ACA.[2] As the Cooks sat at the gate, waiting to board the plane, Mr. Cook observed a man run towards the gate and stop abruptly. That man, later identified as Frederic Girard, a French national traveling alone, then obtained a cash refund for one of the two tickets he had purchased for flight number 6116. Girard "exhibited erratic behavior," such as shifting from one foot to another and "constantly taking off his sunglasses and jacket and putting them back on." Appellant's App. at 593. In addition, Girard's eyes were red, bloodshot, and glassy, and his face was red. Mr. Cook believed that Girard was either intoxicated or mentally unfit.

Girard was the last passenger to board the plane prior to departure, and he "was unruly in the manner in which he board-

ed." *Id.* at 594. Girard "ran quickly and jumped up the steps leading into the plane like a gymnast. He sprung [i]nto the plane and attempt[ed] to s[i]t in a seat nearest the cockpit. He was ordered to the back of the plane by ... [flight attendant] Mark Dickerhoff[.]" *Id.* Girard's boarding pass indicated that he was to sit in the eighth row, but Dickerhoff instructed him to sit in the last row, row twelve. Prior to take-off, Girard's erratic behavior continued, and he pressed the attendant call button and light switch above his head repeatedly. Also prior to take-off, Mr. Cook approached Dickerhoff and expressed his concern that Girard was a "security threat." *Id.* Dickerhoff told Mr. Cook that Girard was a "possible security threat" and that he had ordered Girard to sit in the rear of the plane "so he could keep an eye on him." *Id.*

As the plane taxied towards the runway, Girard disregarded Dickerhoff's instructions to remain seated with his seatbelt fastened. Then, after take-off, Girard lit a cigarette, despite having been warned that smoking was prohibited on board. Dickerhoff instructed Girard to extinguish his cigarette, but Girard retained his cigarettes and lighter. At that point, Mr. Cook approached three male passengers on board and asked for their assistance in "protect[ing] the flight if [Girard's] behavior grew worse." *Id.* at 595. Girard's behavior "continued to be erratic, furtive, and unruly." *Id.* He began moving around the plane, sitting in different vacant seats. When Girard walked up the aisle towards the cockpit, Mr. Cook stood up in the aisle to block his way and instructed Girard to sit down. Girard complied, but he lit another cigarette once he was seated in the back row. Dickerhoff confronted Girard,

---

**2.** As will be discussed *infra,* Delta and ACA have an agreement whereby ACA operates certain flights which are ticketed by Delta.

telling him to extinguish the cigarette, and Girard demonstrated "even more aggressive behavior." *Id.* Girard stood up and began yelling "Get back! Get back!" *Id.*

Mr. Cook then enlisted the help of the other male passengers to help him block the aisle, and they approached Girard at the rear of the plane. Mr. Cook told Dickerhoff that he and the other men "were there to back him up." *Id.* at 595–96. When one of the passengers asked Girard to sit down, Girard responded by showing an "evil grin" and stomping his feet on the floor. *Id.* at 596. Girard then shouted, "Get back! World Trade Center! Americans! New York City!" *Id.* And Girard began muttering in French. Eventually, two Delta employees on board approached Girard and said something to him in French, which led to Girard taking his seat. The pilot diverted the flight to land in Cleveland, where police officers met the plane and arrested Girard. The flight then left Cleveland and flew to New York City as planned.

The Cooks filed a small claim in Marion County against ACA, Delta, and Globe, and the court entered judgment in favor of the Defendants. The Cooks then appealed to the Marion Superior Court [3] and filed a complaint against the Defendants alleging negligent infliction of emotional distress and breach of contract. The Cooks maintained in relevant part that ACA and Delta were negligent in permitting Girard to board the flight despite his display of erratic behavior prior to boarding. The Cooks subsequently filed a motion to compel discovery, alleging that the Defendants had failed to produce a requested copy of the passenger manifest for the flight at issue. The trial court granted that motion.

ACA filed a motion for summary judgment alleging that it was entitled to judgment as a matter of law because: (1) the Cooks' claims are preempted by federal law; (2) their complaint is barred for failure to timely file their appeal with the Marion Superior Court; and (3) the Cooks are not entitled to damages under Indiana's modified impact rule. Delta and Globe also filed a joint motion for summary judgment alleging that they were entitled to judgment as a matter of law because: (1) the Cooks are not entitled to damages under Indiana's modified impact rule; (2) the undisputed evidence shows that there was no breach of contract; and (3) the undisputed evidence shows that Delta and ACA are not partners, as the Cooks alleged in their complaint.

Following a hearing, the trial court entered partial summary judgment in favor of each of the Defendants and denied their motions in part. In particular, the trial court concluded, as a matter of law, that neither Delta nor ACA breached any contract with the Cooks, that federal law does not preempt the Cooks' claims, that Delta is not liable to the Cooks on their negligence claims, and that the Cooks' claims are not precluded under Indiana's modified impact rule. This interlocutory appeal and cross-appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing summary judgment, this court views the same matters and issues that were before the trial court and follows the same process. *Estate of Taylor ex rel. Taylor v. Muncie Med. Investors, L.P.,* 727 N.E.2d 466, 469 (Ind.Ct. App.2000), *trans. denied.* We construe all facts and reasonable inferences to be drawn from those facts in favor of the non-

---

**3.** Indiana Code Section 33–11.6–4–14 provides that all appeals from judgments of the Marion Small Claims Court shall be taken to the Marion Superior Court.

moving party. *Jesse v. American Cmty. Mut. Ins. Co.*, 725 N.E.2d 420, 423 (Ind.Ct. App.2000), *trans. denied.* Summary judgment is appropriate when the designated evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law. *Zawistoski v. Gene B. Glick Co., Inc.*, 727 N.E.2d 790, 792 (Ind.Ct.App.2000).

We note that the trial court entered findings and conclusions in support of summary judgment. Although we are not bound by the trial court's findings and conclusions, they aid our review by providing reasons for the trial court's decision. *See Ledbetter v. Ball Mem'l Hosp.*, 724 N.E.2d 1113, 1116 (Ind.Ct.App.2000), *trans. denied.* If the trial court's entry of summary judgment can be sustained on any theory or basis in the record, we must affirm. *Id.*

### Issue One: Federal Preemption

ACA first contends that the trial court erred when it concluded that the Cooks' claims are not preempted under federal law. In particular, ACA maintains that the claims are implicitly preempted under the Federal Aviation Act of 1958 ("the FAA") and explicitly preempted under the Airline Deregulation Act of 1978 ("the ADA"). We cannot agree. As this is a case of first impression in Indiana, we look to other jurisdictions for guidance.

■ Article VI of the United States Constitution provides in relevant part that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *McCartin McAuliffe Mechanical Contractor, Inc. v. Midwest Gas Storage, Inc.*, 685 N.E.2d 165, 168–69 (Ind.Ct.App.1997) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)), *trans. denied.* Accordingly, the purpose of Congress is the ultimate touchstone of preemption analysis. *Id.*

■ Congress's intent to preempt state law may be express or implied. *Id.* In addition, a federal statute will override a state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law. *Id.*

■ We first address ACA's contention that the FAA implicitly preempts "the entire field of aviation safety and operational standards[.]" Brief of Appellant at 10. The FAA empowered the Civil Aeronautics Board to regulate the interstate airline industry. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 222, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). Although the FAA authorized the Board both to regulate fares and to take administrative action against deceptive trade practices, the federal legislation originally contained no clause preempting state regulation. *Id.* And the FAA contained a "saving clause" which provided: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C. § 1506 (current version at 49 U.S.C. § 40120(c)). In 1978, Congress enacted the ADA, which largely deregulated domestic air transport. *Wolens*, 513 U.S. at 222, 115 S.Ct. 817. The ADA includes a

preemption clause, which provides: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier[.]" 49 U.S.C. § 1305(a)(1) (current version at 49 U.S.C. § 41713).[4] The ADA also contains a saving clause, which provides that "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c).

ACA's contention that the FAA implicitly preempts the field of aviation safety fails in light of the ADA's express preemption provision and saving clause. The United States Supreme Court has stated as follows:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (emphasis original, citations omitted). Following that reasoning in *Cipollone*, the Oregon Court of Appeals has held that "when coupled with [the saving clause], congressional enactment of section 1305(a)(1) [of the ADA] precludes implicit 'field preemption.'" *Anderson v. Ever-*

*green International Airlines, Inc.*, 131 Or. App. 726, 886 P.2d 1068, 1070 (1994). We agree with the Oregon Court of Appeals and hold that there is no field preemption here.

■ Next, we address whether the ADA's express preemption clause, 49 U.S.C. § 1305(a)(1), applies here. As we have noted, the purpose of Congress is the ultimate touchstone of preemption analysis. *See McCartin McAuliffe*, 685 N.E.2d at 169. "In 1978, Congress . . . determin[ed] that efficiency, innovation, low prices, variety, and quality would be promoted by reliance on competitive market forces rather than pervasive federal regulation." *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 (5th Cir.1995). To prevent states from "undo[ing] federal deregulation with regulation of their own," Congress enacted the ADA's preemption clause, which preempts state laws "relating to rates, routes, or service of any air carrier[.]" *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1262–63 (9th Cir.1998).

The United States Supreme Court has twice addressed the scope of Section 1305(a)(1), first in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), and then in *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). As the Court of Appeals for the Ninth Circuit observed:

> In both [*Morales* and *Wolens* ], the Supreme Court took great pains to articulate the boundaries of the preemption, indicating that the ADA would not preempt most state law tort claims. *See Wolens*, 513 U.S. at 230–33, 115 S.Ct. 817; *Morales*, 504 U.S. at 390, 112 S.Ct.

---

4. For ease of discussion, we refer to the relevant federal statutes using their former citations. We note that none of the amendments are substantive. *See, e.g., Wolens*, 513 U.S. at

223 n. 1, 115 S.Ct. 817 (stating Congress did not intend "substantive change" in revision to § 1305(a)(1)).

2031. In *Morales*, the Court faced the question of whether airlines were subject to states' laws banning deceptive advertising. The Court concluded that state restrictions on advertising were precisely the type of economic regulation that Congress intended to preempt in deregulating the airline industry: "Restrictions on advertising serv[e] to increase the difficulty of discovering the lowest cost seller ... and [reduce] the incentive to price competitively .... [p]rice advertising surely 'relates to' price." *Morales*, 504 U.S. at 388–89, 112 S.Ct. 2031 (internal citations and quotations omitted). As such, the Court held that state actions based upon these laws had the "forbidden significant effect" on rates, routes, or service, and thus were preempted. *Id.* at 388, 112 S.Ct. 2031. However, the Court explicitly limited its holding:

> [W]e do not ... set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines ... [s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner to have pre-emptive effect.

*Id.* at 390, 112 S.Ct. 2031 (internal citations and quotations omitted).

Likewise, in *Wolens*, the Court recognized the boundaries of § 1305(a)(1). In *Wolens*, the Court concluded that plaintiffs' claims for breach of contract, stemming from the airline's unilateral decision to devalue plaintiffs' frequent flier miles were not preempted. *See Wolens*, 513 U.S. at 222, 115 S.Ct. 817. In so doing, the Court held that Congress did not intend to preempt common law contract claims. And, although the majority did not specifically address whether personal injury claims would be preempted, both concurring opinions did. Justice O'Connor opined:

> Many cases decided since *Morales* have allowed personal injury claims to proceed, even though none has said that a State is not "enforcing" its "law" when it imposes tort liability on an airline. In those cases, courts have found the particular tort claims at issue not to "relate" to airline "services," much as we suggested in *Morales* that state laws against gambling and prostitution would be too tenuously related to airline services to be preempted.

*Id.* at 242, 115 S.Ct. 817 (O'Connor, J., concurring in part and dissenting in part) (internal citations omitted). Further, Justice Stevens noted:

> In my opinion, private tort actions based on common-law negligence or fraud ... are not pre-empted.... Presumably, if an airline were negligent in a way that somehow affected its rates, routes, or services ... the majority would not hold all common-law negligence rules to be pre-empted by the ADA.

*Id.* at 235–36, 115 S.Ct. 817 (Stevens, J., concurring in part and dissenting in part).

> Although *Morales* and *Wolens* do not directly resolve whether the § 1305(a)(1) preemption encompasses state law tort claims, they certainly suggest that such claims are not within the intended reach of the preemption.

*Charas*, 160 F.3d at 1263–64 (internal footnote omitted).

Following *Morales* and *Wolens*, the scope of the § 1305(a)(1) preemption has been "a source of considerable dispute" among courts. *See id.* at 1263. In 1995, the Court of Appeals for the Fifth Circuit addressed the definition of the term "service" as it is used in the preemption clause. *See Hodges*, 44 F.3d at 334. In that case, an airline passenger was injured when a

case of rum fell out of an overhead bin and struck her arm. When the passenger sued the airline for negligence "in allowing the case of rum to be stowed in an overhead storage bin," the airline moved for summary judgment, alleging that her state law tort claim was preempted under § 1305(a)(1). *Id.* at 340. Specifically, the airline contended that the "accident arose out of the 'services' of baggage handling and boarding," and that "all claims related to 'services' are preempted." *Id.* at 338–39.

The *Hodges* court noted that under *Morales,* "whatever state laws 'relate to rates, routes or services' are broadly preempted," but the court did not define "service." *Id.* at 336. The *Hodges* court concluded that:

> "Services" generally represent a bargained-for or anticipated provision of labor from one party to another. If the element of bargain or agreement is incorporated in our understanding of services, it leads to a concern with the contractual arrangement between the airline and the user of the service. *Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.* These matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline. It is these [contractual] features of air transportation that we believe Congress intended to de-regulate as "services" and broadly to protect from state regulation.

*Id.* (citation omitted, emphasis added). Further, the court observed that:

> A facile analogy to *Morales* ... could suggest that "services" includes all aspects of the air carrier's "utility" to its customers, hence, any state tort claim

may "relate to" services as a result of its indirect regulatory impact on the airline's practices. Taken to its logical extreme, this argument would suggest that a lawsuit following a fatal airplane crash could relate to "services."

> *That Congress did not, however, intend § 1305(a)(1) to preempt all state claims for personal injury is evident from at least one other provision of the remaining airline regulatory statutes.* Air carriers are required to maintain insurance or self-insurance as prescribed by the Federal Aviation Administration that covers "amounts for which ... air carriers may become liable for bodily injuries to or the death of any person, or for loss of or damage to property of others, resulting from the operation or maintenance of aircraft ..." 49 U.S.C.App. § 1371(q) (1994); *see also,* 14 C.F.R. § 205.5(a) (1992) (insurance regs.). The importance of § 1371(q) cannot be understated, for it can only be understood to qualify the scope of "services" removed from state regulation by § 1305(a)(1). *A complete preemption of state law in this area would have rendered any requirement of insurance coverage nugatory.*

*Id.* at 338 (emphases added, footnote omitted).

The court concluded that "[g]enerally, ... state tort laws *concerning the operation and maintenance of aircraft* can be enforced consistently with and distinctly from the services that Congress deregulated." *Id.* at 339. And the court held:

> [Hodges'] tort claim for personal injury has no specific "reference to" airline services, although it does derive from the operation of the aircraft. Nor would enforcement of her claim significantly affect Delta's services, as defined above. As other cases have recently held, *this type of claim does not relate to Delta's*

*services and is not preempted by § 1305(a)(1).*

*Id.* at 340 (emphasis added, citation omitted).

The Court of Appeals for the Ninth Circuit has also defined "service" as that term is used in § 1305(a)(1), and that court stated as follows:

In attempting to deduce [the meaning of "service"], we are mindful that principles of statutory construction require us to consider the term within its context. Airlines' "rates" and "routes" generally refer to the point-to-point transport of passengers. "Rates" indicates price; "routes" refers to courses of travel. It therefore follows that *"service," when juxtaposed to "rates" and "routes," refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided* .... To interpret "service" more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does. It seems clear to us that that is not what Congress intended.

\* \* \*

We conclude that when Congress enacted *federal* economic deregulation of the airlines, it intended to insulate the industry from possible *state* economic regulation as well. It intended to encourage the forces of competition. *It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct.* Like "rates" and "routes," Congress used "service" in § 1305(a)(1) in the public utility sense— i.e., the provision of air transportation to and from various markets at various times. In that context, "service" does not refer to the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions.

*Charas,* 160 F.3d at 1266.

In this case, the question is whether ACA's decision to allow Girard to board the Cooks' flight was part of its "service" in the context of § 1305(a)(1). As we have noted, the *Hodges* court's definition of "service" included "boarding procedures." 44 F.3d at 336. And some courts have subsequently concluded that an airline's decision to *deny* boarding to a passenger is part of its service in this context and have, therefore, held that those passengers' suits are preempted. *See, e.g., Williams v. Midwest Airlines, Inc.,* 2004 WL 1368337, \* 3 (E.D. Wis. June 9, 2004) (holding plaintiffs' state tort claims based on alleged wrongful refusal to allow passengers to board preempted by the ADA); *Chukwu v. Board of Directors British Airways,* 889 F.Supp. 12, 14 (D.Mass.1995) (holding plaintiff's claim that airline wrongfully denied brother boarding preempted by ADA).

But, when confronted with a set of facts closely analogous to those in this case, the Court of Appeals for the Fifth Circuit, the same court that decided *Hodges,* held that there was no preemption. Specifically, in *Smith v. America West Airlines, Inc.,* 44 F.3d 344 (5th Cir.1995), passengers sued an airline for negligently permitting a would-be hijacker to board the passengers' flight. The airline moved to dismiss the complaint on the basis that the passengers' claims were preempted by § 1305(a)(1), and the court granted that motion. *Id.* at 345. On appeal, the court addressed the issue as follows:

Applying the *Hodges* framework, it first appears that the scope of § 1305(a)(1) preemption will not be affected by 49 U.S.C.App. § 1371(q), which requires airlines to carry insurance to cover personal injury arising out of the operation or maintenance of aircraft. Neither the

alleged failure of America West's ticket agent to perceive that the hijacker was deranged when she sold him a ticket nor appellants' other allegations of negligence are part of the operation or maintenance of aircraft.

Appellants' claims are thus preempted only if they "relate to" "services" within the scope of § 1305(a)(1). We conclude that they do not relate to preempted services.... As explained in *Hodges*, § 1305(a)(1) assured the economic deregulation of the airlines by rendering them immune from rate and service regulation by the states after the demise of federal regulation. *Neither the language nor the history of the ADA implies that Congress was attempting to displace state personal injury tort law concerning the safety of the airline business.* The Supreme Court counsels that courts should not lightly infer in federal actions an attempt to preempt traditional state police powers. Under these circumstances, *it is reasonable to interpret the "service" of boarding to be limited to economic decisions concerning boarding, e.g., overbooking or charter arrangements, and contractual decisions whether to board particular ticketed passengers.*

\* \* \*

The Smiths' claim issues from a ... perspective that has nothing to do either with the airlines' economic practices regarding boarding or with the boarding practices that America West applied to the Smith appellants. Instead, *the Smiths' claim is that the safety of their flight was jeopardized by the airline's permitting a visibly deranged man to board.* If appellants ultimately recover damages, the judgment could affect the airline's ticket selling, training or security practices, but it would not regulate the economic or contractual aspects of boarding. Any such effect would be *"too tenuous, remote or peripheral"* to be preempted by § *1305(a)(1).*

*Id.* at 346–47 (emphases added, citations omitted).

We adopt the reasoning set out in *Smith* and *Charas* and hold that here, where the Cooks claim "that the safety of their flight was jeopardized by the airline's permitting a visibly deranged man to board," their state tort law claims are not preempted by § 1305(a)(1) of the ADA.[5] *See id.* at 347. The trial court did not err when it concluded that the Cooks' claims are not preempted by federal law.[6]

### Issue Two: Stating a Claim Upon Which Relief Can Be Granted

■ Next, ACA contends that the trial court erred when it concluded that the

---

**5.** Our research reveals only one opinion decided by the Court of Appeals for the Seventh Circuit touching on the issue presented here. In *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir.1996), the court held that a travel agency's claims against an airline for breach of contract and slander/defamation were not preempted by § 1305(a)(1), but that the agency's intentional tort claims, which were based on the airline's refusal to allow certain passengers to board, were preempted. The court basically followed the reasoning in *Morales*, *Wolens*, and *Hodges*. Because the facts in *Travel All Over the World* are distinguishable from those in this case, we do not find this Seventh Circuit opinion as persuasive as the Fifth Circuit's opinion in *Smith* and the Ninth Circuit's opinion in *Charas*.

**6.** While it has no bearing on the outcome of this appeal, we note that effective February 22, 2002, the Transportation Security Administration assumed responsibility for aviation security previously held by the Federal Aviation Administration. *See* Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat 597 (2001).

Cooks have stated a claim upon which relief can be granted. Specifically, ACA maintains that the Cooks' claims are barred under Indiana's modified impact rule as a matter of law. We cannot agree.

■ In order to maintain a cause of action for negligent infliction of emotional distress under Indiana law, a plaintiff must satisfy the "impact rule." *Alexander v. Scheid,* 726 N.E.2d 272, 283 (Ind.2000). This rule originally consisted of three elements: (1) an impact on the plaintiff; (2) that causes physical injury to the plaintiff; (3) that in turn causes the emotional distress. *Id.* This rule precluded recovery for the case in which a plaintiff experienced real mental stress in the absence of physical injury. *Id.* But our supreme court later modified the impact rule and held:

> When ... a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, ... such a plaintiff is entitled to maintain an action to recover for that emotional trauma *without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.*

*Shuamber v. Henderson,* 579 N.E.2d 452, 456 (Ind.1991) (emphasis added).

Thus, in *Groves v. Taylor,* 729 N.E.2d 569 (Ind.2000), where an eight-year-old girl witnessed the immediate aftermath of her little brother being struck and killed by a passing police vehicle, our supreme court held that a bystander in such a circumstance need not have sustained any physical impact to satisfy the rule. The court " 'recognized the diminished significance of contemporaneous physical injuries in identifying legitimate claims of emotional trauma from the mere spurious. Rather, 'direct impact' is properly understood as the requisite measure of 'direct involvement' in the incident giving rise to the emotional trauma.' " *Id.* at 572 (quoting *Conder v. Wood,* 716 N.E.2d 432, 435 (Ind. 1999)). The court explained further:

> In the present case, it is undisputed that the plaintiff did not suffer the kind of direct impact required by *Shuamber* to recover as a bystander for emotional distress. However, as the foregoing passage from *Conder* makes clear, the reason for requiring direct involvement is to be able to distinguish legitimate claims of emotional trauma from the mere spurious. The value of requiring "direct impact" is that it provides clear and unambiguous evidence that the plaintiff was so directly involved in the incident giving rise to the emotional trauma that it is unlikely that the claim is merely spurious.

> Given that the prevention of merely spurious claims is the rationale for the *Shuamber* rule, logic dictates that there may well be circumstances where, *while the plaintiff does not sustain a direct impact, the plaintiff is sufficiently directly involved in the incident* giving rise to the emotional trauma that we are able to distinguish legitimate claims from the mere spurious.

*Id.* And the court held that:

> where the direct impact test is not met, a bystander may nevertheless establish "direct involvement" by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise tortious conduct.

*Id.* at 573.

Accordingly, this court has held that the modified impact rule was satisfied where

plaintiffs claimed emotional distress after discovering that their son's cremated remains were missing twelve years after his death. *Blackwell v. Dykes Funeral Homes, Inc.*, 771 N.E.2d 692 (Ind.Ct.App. 2002), *trans. denied.* Relying on our supreme court's "persuasive and compelling" reasoning in *Groves*, we concluded that the Blackwells were "sufficiently and directly involved in the incident" and that "[w]hile there was no physical impact, [they] have alleged serious emotional trauma and it is of a kind that a reasonable person would experience." *Id.* at 697; *but see Ritchhart v. Indianapolis Public Schools*, 812 N.E.2d 189, 2004 WL 1637678 (Ind.Ct.App. July 23, 2004) (holding plaintiff's claim barred by modified impact rule where her son was not physically injured when school bus dropped him off at home three hours late and plaintiff "did not witness any part of the incident giving rise to her complaint."). Then, in *Keim v. Potter*, 783 N.E.2d 731, 735 (Ind.Ct.App.2003), this court held that a patient who was mistakenly diagnosed as having hepatitis C was "directly involved" in the result of his physician's negligence. Thus, we held that his claim for negligent infliction of emotional distress satisfied the modified impact rule. *Id.*

In this case, the Cooks were "directly involved" in an incident involving Girard's erratic behavior aboard a flight to New York City. This incident occurred in the aftermath of the attacks on the World Trade Center and the more recent attempt by a foreign national to ignite explosive material in his shoe aboard a flight. We cannot say, as a matter of law, that their claimed emotional injuries are not "serious in nature and of a kind and extent normally expected to occur in a reasonable person" under similar circumstances. *See Keim*, 783 N.E.2d at 734 (quoting *Shuamber*, 579 N.E.2d at 456). The Cooks are entitled to present their emotional dam-

ages claims to a trier of fact. The trial court properly denied ACA's motion for summary judgment on this issue.

### Issue Three: Timeliness of Appeal

■ ACA also contends that the Cooks' appeal is barred because they did not timely appeal the Small Claims Court's judgment. Specifically, ACA maintains that the Cooks did not comply with Marion County Civil Division Rule 81.1, which provides that:

A cause of action which comes to the Marion Superior Court from the Small Claims Courts of Marion County for either jury trial or appeal shall be repled in its entirety commencing with the plaintiff below filing a new Complaint in compliance with the Indiana Rules of Trial Procedure. The new Complaint shall be filed within twenty (20) days of the date the cause is docketed and filed with the Marion Superior Court. Failure to comply with this Rule shall result in the Court imposing sanctions *which may include dismissal or default where appropriate.*

(Emphasis added). ACA asserts that here, the Cooks repled their complaint with the Marion Superior court more than twenty days after the case was docketed. As such, ACA asserts that the trial court should have dismissed the case.

But ACA ignores the fact that dismissal is *discretionary* under Rule 81.1. In a footnote in its findings and conclusions on summary judgment, the trial court notes that it was exercising its discretion on this issue and "finds no judgment for defendants, dismissal, or other sanctions warranted under local Rule 81.1[.]" Appellant's App. at 24 n. 1. ACA has not demonstrated that the trial court abused its discretion under these circumstances.

### Issue Four: Motion to Compel

▮ Next, ACA contends that the trial court abused its discretion when it granted the Cooks' motion to compel discovery of the passenger list. In particular, ACA maintains that "[p]roduction of the passenger list violates federal regulations prohibiting the production of such information except to the family of a passenger, the State Department or the National Transportation Safety Board (NTSB) . . . following an aviation disaster." Brief of Appellant at 26. But the trial court ordered ACA to produce the list subject to a protective order restricting its use by the Cooks.

▮ A trial court enjoys broad discretion when ruling upon discovery matters and we will interfere only where an abuse of discretion is apparent. *Davidson v. Perron,* 756 N.E.2d 1007, 1012 (Ind.Ct. App.2001). An abuse of discretion occurs where the decision is against the logic and natural inferences to be drawn from the facts of the case. *Id.* Because of the fact-sensitive nature of discovery issues, a trial court's ruling is cloaked with a strong presumption of correctness. *Id.*

Pursuant to the Aviation Security Improvement Act of 1990, 14 Code of Federal Regulations Part 243, the Department of Transportation requires that certificated air carriers and large foreign air carriers collect the full names of U.S. citizens traveling on flight segments to or from the United States, along with passport numbers, and solicit a contact name and telephone number for each passenger. *See Wallman v. Tower Air, Inc.,* 189 F.R.D. 566, 568 (N.D.Cal.1999). In the event of an aviation disaster, the contact information is used to locate and reach the contacts for each passenger. *Id.* The purpose of collecting the passenger list and contact list is to enable the NTSB to reach family members of passengers who have been seriously injured or killed in a plane crash. *Id.*

ACA is correct that pursuant to 14 C.F.R. § 243.9, the passenger list may not be released, except to the family of a passenger, the State Department, or the NTSB. Subsection (d) of that regulation provides that the information shall be used only for notification of family members and contacts following an aviation disaster and not for commercial or marketing purposes. Thus, "[t]he confidentiality provision is directed at least in part at preventing the airlines or anyone else from using this information for profit." *Wallman,* 189 F.R.D. at 568.

"Despite the confidentiality provisions of the statute, there is adequate justification" within the discovery rules for producing the list. *See id.* As the trial court correctly noted in this case, Trial Rule 26(B)(1) provides in relevant part that the scope of discovery includes "the identity and location of persons having knowledge of any discoverable matter." And, as the trial court correctly found, the other passengers on the Cooks' flight are all potential witnesses in this case. In granting the motion to compel discovery of the passenger list, the trial court properly included a protective order instructing the parties to keep the information contained in the list confidential and to use the information solely for litigation purposes. Therefore, we cannot say that the trial court abused its discretion when it granted the Cooks' motion to compel discovery. *See, e.g., Wallman,* 189 F.R.D. at 569 (ordering airline to produce passenger list, subject to protective order, in negligence action following near crash-landing).

### CROSS–APPEAL

#### Issue One: Breach of Contract

▮ The Cooks first contend that the trial court erred when it entered summary

judgment in favor of ACA and Delta on their breach of contract claims. The Cooks allege in relevant part that ACA and Delta breached the parties' contracts in "fail[ing] to provide a direct, non-stop, and safe" flight to New York City, in selling Girard a ticket, and in permitting Girard to board the plane. Appellant's App. at 44.

The Cooks and Delta entered into a "contract of carriage," which is comprised of the passenger ticket and the incorporated tariff provisions. *See* Brief of Cross–Appellee Delta at 6; 14 C.F.R. § 253.4. That contract provides in relevant part as follows:

> [Delta] will refuse to transport or will remove at any point any passenger:
>
> \* \* \*
>
> 1) whose conduct is disorderly, abusive or violent;
>
> \* \* \*
>
> 3) who appears to be intoxicated or under the influence of drugs;
>
> 4) who attempts to interfere with any member of the flight crew in the pursuit of their duties;
>
> \* \* \*
>
> 7) who is unable to sit in a seat with the seatbelt fastened;
>
> \* \* \*
>
> 10) who is [of] unsound mind, whose behavior may be hazardous to himself/herself, the crew, or other passengers[.]

Appellant's App. at 340–41.

The Cooks maintain that the designated evidence establishes questions of fact regarding whether Delta breached its contractual duty to refuse to transport Girard in light of his erratic behavior at the gate prior to boarding.[7] The undisputed evidence shows that Delta employees were in charge of ticketing and boarding at the gate in Indianapolis. Appellant's App. at 311. And the Cooks designated evidence showing that Girard: (1) approached the gate at a high rate of speed; (2) had paid for two tickets on the flight with cash; (3) returned one of those tickets for a refund; (4) exhibited unusual behavior, including shifting from one foot to another, and taking his sunglasses and jacket on and off multiple times; and (5) exhibited bloodshot and glassy eyes and a red face. That evidence establishes a question of fact regarding whether Delta breached its contractual duty to refuse to transport Girard under the circumstances. *See, e.g., Indianapolis Public Housing Agency v. Aegean Const. Servs., Inc.,* 755 N.E.2d 237, 240 (Ind.Ct.App.2001) (holding question of fact existed regarding whether contractor completed project in timely and workmanlike manner under parties' contract). The trial court erred when it entered summary judgment in favor of Delta on this issue.

◼ ACA was bound by the terms of the Cooks' contracts with Delta under the terms of ACA's contract with Delta. Thus, ACA also had a contractual duty to refuse to transport Girard and/or to remove him from the flight if he met any of the criteria set out in the contract. The

---

**7.** The contract of carriage establishes Delta's right to refuse to transport or to remove a passenger for cause. Delta and ACA do not question the underlying premise of the Cooks' breach of contract claim, namely, that the contract of carriage creates not only a right in the carrier but a corresponding duty to refuse to transport or to remove a passenger for the benefit of other passengers.

designated evidence shows that Girard was assigned to sit in the eighth row of the plane, but that when he boarded, the flight attendant, an ACA employee, instructed him to sit in the rear of the plane, in the twelfth row. Prior to take-off, Girard continued to exhibit erratic behavior, including taking his sunglasses and jacket off and putting them back on repeatedly and pressing the attendant call button and light switch located above his seat several times. In addition, as the plane was taxiing onto the runway, Girard unbuckled his seatbelt and stood up, despite having been warned to remain seated with his seatbelt fastened. In light of this evidence, we cannot say that ACA is entitled to summary judgment as a matter of law on the issue of whether it breached its contract to refuse to transport Girard. While ACA honored its agreement when it subsequently removed Girard in Cleveland, a genuine issue of material fact exists regarding whether ACA should have removed Girard from the plane prior to take-off from Indianapolis.

### Issue Two: Negligence Claims Against Delta

■ Finally, the Cooks contend that the trial court erred when it entered summary judgment in favor of Delta on their negligence claims. Specifically, the Cooks assert that Delta and ACA are partners and are, therefore, jointly and severally liable for their negligence.[8] But the Cooks have not directed us to any designated evidence to support their contention that Delta and ACA are partners or are otherwise jointly and severally liable. Indeed, the Cooks do not support their argument with any citations to the record, other than a citation to one page of the trial court's

---

order. As such, the issue is waived. *See* Ind. Appellate Rule 46(A)(8)(a).

### CONCLUSION

In sum, the trial court did not err when it: (1) concluded that the Cooks' tort claims are not preempted by federal law; (2) concluded that the Cooks have stated a claim upon which relief can be granted; (3) concluded that the Cooks' appeal of the Small Claims Court's decision was timely; and (4) granted the Cooks' motion to compel discovery. But we hold that there are genuine issues of material fact regarding whether Delta and ACA breached the terms of their contracts with the Cooks. Thus, we reverse the trial court's entry of summary judgment in favor of Delta and ACA on the breach of contract claims and remand for further proceedings consistent with this opinion. Finally, the Cooks have waived appellate review of whether the trial court erred when it entered summary judgment in favor of Delta on their negligence claims.

Affirmed in part, reversed in part, and remanded for further proceedings.

SULLIVAN, J., and BARNES, J., concur.

---

8. The Cooks make no contention on appeal that Delta should be liable for any alleged pre-flight negligence despite the terms of Delta's contract with ACA. As such, we do not address that issue.