Tonia RYAN and Kevin Ryan, Appellants–Plaintiffs,

v.

Thomas BROWN, M.D. and Decatur County Memorial Hospital, Appellees–Defendants.

No. 16A04–0404–CV–235.

Court of Appeals of Indiana.

May 11, 2005.

Lance D. Cline, Marie Troendle Greer, Cline, Farrell, Christie, Lee & Caress, P.C., Indianapolis, IN, Attorneys for Appellant.

Marilyn A. Young, Steven J. Cohen, Zeigler, Cohen, & Koch, Indianapolis, IN, Attorneys for Appellee Thomas M. Brown, M.D.

Angela M. Smith, Hall, Render, Killian, Heath & Lyman, Indianapolis, IN, Attorney for Appellee Decatur County Memorial Hospital.

## OPINION

ROBB, Judge.

Tonia and Kevin Ryan ("the Ryans") appeal the trial court's order granting partial summary judgment to Dr. Thomas Brown and Decatur County Memorial Hospital ("DCMH"). We affirm in part, reverse in part, and remand.

### Issues

The Ryans raise three issues for our review, which we consolidate and restate as follows:

1. Whether the trial court properly determined as a matter of law that the Indiana Medical Malpractice Act does not create a separate cause of action for the wrongful death of a fetus; and

2. Whether the trial court properly determined as a matter of law that neither Tonia nor Kevin Ryan have a claim for negligent infliction of emotional distress.

## Facts and Procedural History

In 1998, Tonia Ryan became pregnant with her husband, Kevin Ryan's, baby. This was Tonia's first pregnancy. Prior to becoming pregnant, Tonia had no significant past medical history and no history of hypertension. Tonia's doctor was Dr. Thomas Brown. Tonia had her first prenatal visit with Dr. Brown on May 12, 1998. Throughout the rest of the year, Tonia had several appointments with Dr. Brown. During each of these check-ups, Tonia's blood pressure was taken. On June 8, 1998, Tonia's blood pressure was recorded as 170/80, and on September 28, 1998, Tonia's blood pressure was 150/78. Dr. Brown did not give Tonia any advice about her blood pressure during either of these check-ups. On October 26, 1998, Tonia's blood pressure was 150/90, and Dr. Brown instructed Tonia to stay off her feet as much as possible. Tonia's blood pressure on November 9, 1998, was 180/80 but a second reading only found it to be 150/82. Tonia's blood pressure on November 16, November 20, and November 23 were 140/90, 170/80 with a second reading of 140/78, and 170/90 with a second reading of 163/84.[1]

On December 7, 1998, Tonia, who at that time was in her thirty-fourth week of pregnancy, called Dr. Brown's office to report her concern about having noticed decreased fetal movement over the previous two days. Tonia and Kevin both met with Dr. Brown later that day. Tonia's blood pressure was recorded as 172/98, and she had 4+ proteinuria in her urine.[2] Dr. Brown did detect fetal heart tones. Dr. Brown diagnosed Tonia with preeclampsia, and advised her to admit herself to DCMH. Preeclampsia is a pregnancy-related condition that causes high blood pressure and can affect an expecting mother's kidneys, liver, brain, and placenta. *Preeclampsia*, available at http://my.webmd. com/hw/health_guide _atoz/stp1755.asp? navbar=hw2837. If untreated, preeclampsia may deprive a fetus of oxygen. *Id.*

Kevin and Tonia both went to DCMH where Kevin helped Tonia through the admissions process. Tonia was admitted to DCMH at 3:50 p.m. with an initial blood pressure of 190/116. Shortly after Tonia was admitted to DCMH, Kevin had to leave for work. The initial nursing assessment of Tonia at DCMH revealed that she had abdominal and uterine pain, edema in her feet and lower legs, visual disturbances, and a headache. These symptoms suggested the possibility of an impending placental abruption that could threaten the life of Tonia and Kevin's child, whom they had named Ray. This information was not timely relayed to Dr. Brown. At 6:45 p.m., Tonia discovered that she had vaginal bleeding and reported this to her nurse. Tonia's nurse reported this to Dr. Brown at 7:10 p.m., and Dr. Brown instructed the nurse to have a biophysical profile performed.

Dr. Brown arrived at the hospital at approximately 8:15 p.m. and an ultrasound was preformed on Tonia shortly thereafter. The ultrasound revealed that Ray had died in utero. Kevin was called at work and asked to come to DCMH. When Kevin arrived at DCMH, Dr. Brown told him that Ray had died. Kevin then informed Tonia of Ray's death.

---

1. Generally, a blood pressure of 140/90 is considered elevated. *Preeclampsia, available at* http://my.webmd.com /hw/health_guide _atoz/stp1755. asp?navbar=hw2837.

2. The presence of protein in a pregnant woman's urine is one of the characteristics of preeclampsia. Denise Chism, *Preeclampsia, Toxemia, and Pregnancy Induced Hypertension, available at* http://my.webmd.com /content/article/ 4/1680_51845.htm.

Because Tonia's condition was deteriorating, Dr. Brown attempted to induce labor but was unsuccessful. Lab reports indicated that Tonia was beginning to suffer from HELLP Syndrome.[3] At this point, Dr. Brown decided to transfer Tonia to Methodist Hospital in Indianapolis. Kevin rode with Tonia as she was transferred to Methodist Hospital in an ambulance. At Methodist, Ray was delivered stillborn, via a vacuum assisted vaginal delivery, on December 8, 1998. After Ray was delivered, both Tonia and Kevin had the opportunity to hold their son. Tonia remained hospitalized at Methodist for two days where she received treatment to stabilize her condition.

On November 18, 1999, the Ryans filed a proposed complaint for damages with the Indiana Department of Insurance alleging negligence on the part of Dr. Brown and the nurses employed by DCMH. A medical review panel unanimously found that Dr. Brown and DCMH failed to meet the applicable standard of care and that such conduct was a factor in the damages incurred by the Ryans.

The Ryans filed their complaint against Dr. Brown and DCMH in the Decatur County Circuit Court on May 10, 2002. In their complaint, the Ryans alleged that Dr. Brown and various nurses at DCMH committed malpractice in their treatment of Tonia and Ray. The Ryans alleged that under Indiana's Medical Malpractice Act, they could bring a claim for the wrongful death of Ray. Both Tonia and Kevin also brought claims for negligent infliction of emotional distress.

On July 3, 2003, Dr. Brown filed a motion for summary judgment arguing that the Ryans were barred from seeking damages for the death of Ray pursuant to Indiana's Wrongful Death of a Child Statute. The Ryans filed a brief in opposition to Dr. Brown's motion for summary judgment on November 12, 2003. On January 23, 2004, Dr. Brown converted his motion for summary judgment into a motion for partial summary judgment. In this motion, Dr. Brown conceded that Tonia could bring a negligence claim for her own injuries. On February 12, 2004, DCMH filed its own motion for summary judgment, which essentially joined Dr. Brown's motion for partial summary judgment.

On March 30, 2004, the trial court entered an order granting Dr. Brown's and DCMH's motions for partial summary judgment. The trial court concluded that Dr. Brown and DCMH "are entitled to partial summary judgment on [the Ryans'] claims for the wrongful death of their child as well as their claims for negligent infliction of emotional distress." Appellant's Brief at 2. The trial court also found that Dr. Brown and DCMH "are not entitled to summary judgment on Plaintiff Tonia Ryan's claims for damages for her own injuries." *Id.* This appeal ensued.

*Discussion and Decision*

I. Standard of Review

The Ryans appeal the trial court's order granting Dr. Brown and DCMH's motions for partial summary judgment. When determining the propriety of an order granting summary judgment, we use the same standard of review as the trial court. *Geiersbach v. Frieje,*

---

3. HELLP stands for hemolysis (a breakage of red blood cells), elevated liver enzymes, and low platelet count (an essential blood clotting element). *HELLP Syndrome ... A Pregnancy Complication available at* http://www. medicinenet.com/ script/main/art.asp? article-

key=8430. Women with HELLP Syndrome may have bleeding, liver, and blood pressure problems. *HELLP Syndrome and Your Pregnancy available at* http://familydoctor. org/ 456.xml.

807 N.E.2d 114, 116 (Ind.Ct.App.2004), *trans. denied*. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). The party moving for summary judgment has the burden of making a prima facie showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Ling v. Stillwell*, 732 N.E.2d 1270, 1274 (Ind.Ct.App.2000), *trans. denied*. Once the moving party meets these two requirements, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact by setting forth specifically designated facts. *Id.* We must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmoving party, and resolve all doubts against the moving party. *RMJ Enters., Inc. v. Scottsdale Ins. Co.*, 808 N.E.2d 159, 162 (Ind.Ct.App.2004). "If the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we must affirm." *Brady v. Allstate Indem. Co.*, 788 N.E.2d 916, 919 (Ind.Ct.App.2003). Additionally, where the issue presented on appeal is a pure question of law, we review the matter *de novo*. *Bader v. Johnson*, 732 N.E.2d 1212, 1216 (Ind. 2000).

## II. Wrongful Death Action

██ In their complaint, the Ryans brought a claim for damages for the wrongful death of Ray under Indiana's Medical Malpractice Act, Indiana Code section 34–18–1–1 et seq. The trial court concluded that Dr. Brown and DCMH were entitled to partial summary judgment on the Ryans' claim for the wrongful death of Ray. In their appellant's brief, the Ryans argued that the trial court erred in granting Dr. Brown and DCMH's motions for partial summary judgment. The

Ryans asserted that "[t]he Indiana Medical Malpractice Act creates a remedy separate and distinct from the Indiana Wrongful Death of a Child Statute [Indiana Code section 34–23–2–1] for the wrongful death of a viable fetus caused by health care provider negligence." Appellant's Br. at 6. They concluded that "[b]ecause Ray Ryan is recognized as a patient under the Indiana Medical Malpractice Act, his negligently caused in utero death creates a claim for damages for his surviving parents." *Id.*

After the Ryans filed their appellant's brief, our supreme court decided *Chamberlain v. Walpole*, 822 N.E.2d 959 (Ind.2005). In *Chamberlain*, the court agreed with our opinion in *Breece v. Lugo*, 800 N.E.2d 224 (Ind.Ct.App.2003), *trans. denied*. 822 N.E.2d at 964. In *Breece*, we noted that the purpose of Indiana's Medical Malpractice Act was to protect health care providers from malpractice claims and not to create new and additional causes of action. 800 N.E.2d at 228 (citing *Warrick Hospital, Inc. v. Wallace*, 435 N.E.2d 263, 267 (Ind.Ct.App.1982), *rev'd in part and affirmed in part*). We ultimately held in *Breece* that "the Medical Malpractice Act does not create a new cause of action for the wrongful death of a fetus." *Id.* Our supreme court, agreeing with our analysis in *Breece*, held in *Chamberlain* that "the Medical Malpractice Act does not provide a cause of action for damages for a wrongful death where the Wrongful Death Act does not allow such action." 822 N.E.2d at 960. In *Bolin v. Wingert*, 764 N.E.2d 201, 207 (Ind.2002), our supreme court held that only children who are born alive can bring a claim under Indiana's Child Wrongful Death Statute. Therefore, pursuant to *Bolin*, because Ray was not born alive, the Ryans are barred from bringing a claim under Indiana's Child Wrongful Death Statute. Furthermore, pursuant to

*Chamberlain,* because the Ryans are barred from bringing a claim for Ray's death under the Child Wrongful Death Statute, they are also barred from bringing a claim for wrongful death under the Medical Malpractice Act. In their reply brief, the Ryans essentially agree with this analysis and concede that they are barred from seeking recovery for Ray's death under both the Child Wrongful Death Statute and the Medical Malpractice Act.

■ However, in their reply brief, the Ryans argue, for the first time, that the holdings in *Bolin* and *Breece* violate their rights under Article 1, Section 12 and Section 23 of the Indiana Constitution. The Ryans did not raise either of these claims before the trial court. "Failure to raise an issue before the trial court will result in waiver of that issue." *Van Winkle v. Nash,* 761 N.E.2d 856, 859 (Ind.Ct.App. 2002). Thus, the Ryans have waived this issue on appeal.

Therefore, the trial court properly granted Dr. Brown and DCMH's motions for partial summary judgment with regard to the Ryans' wrongful death claim under the Medical Malpractice Act because the Medical Malpractice Act does not create a separate cause of action for the wrongful death of a fetus.

### III. Negligent Infliction of Emotional Distress

The trial court concluded that Dr. Brown and DCMH were entitled to summary judgment with regard to both Tonia and Kevin's claims for negligent infliction of emotional distress. The Ryans argue that the trial court erred in granting Dr. Brown and DCMH's motions for summary judgment on these claims and we agree.

### A. Negligent Infliction of Emotional Distress is Not an Independent Tort

Dr. Brown and DCMH both begin by arguing that in Indiana negligent infliction of emotional distress is not an independent tort, and, thus, in order for the Ryans to assert a claim for negligent infliction of emotional distress they must first prevail in a claim of negligence. They conclude that because the Ryans are barred from bringing a wrongful death claim under the Medical Malpractice Act, there is no underlying claim to serve as the basis for the Ryans' negligent infliction of emotional distress claims, and, therefore, the Ryans may not recover any damages for their emotional distress.

However, the trial court held that Dr. Brown and DCMH were not entitled to summary judgment on Tonia's claims for her own injuries. Tonia alleges that due to the negligence of Dr. Brown and DCMH she suffered a miscarriage. Both Tonia and Kevin allege that due to the negligence of Dr. Brown and DCMH, they suffered emotional distress. Provided that Tonia can prevail on her negligence claim, there is no reason why both she and Kevin should not be able to claim damages for emotional distress.

### B. Tonia's Negligent Infliction of Emotional Distress Claim

■■ The Ryans contend that the trial court erred in granting Dr. Brown and DCMH's motions for summary judgment with regard to Tonia's negligent infliction of emotional distress claim. DCMH concedes that "as articulated in *Breece* and *Bader,* provided that she prevails on her negligence claim, [Tonia] can pursue the recovery for damages associated with her emotional distress arising from the unexpected termination of her pregnancy and the distress caused by enduring the stillbirth." Brief of Appellee, Decatur County Memorial Hospital at 13. Dr. Brown, though, does not make this same concession, so we proceed to consider whether

summary judgment on this issue was proper.

Traditionally, we analyzed claims for negligent infliction of emotional distress under the "impact" rule. *Blackwell v. Dykes Funeral Homes, Inc.*, 771 N.E.2d 692, 695 (Ind.Ct.App.2002), *trans. denied.* Under the impact rule, a plaintiff could not recover for emotional damages unless the emotional distress was accompanied by and resulted from a physical injury caused by an impact to the plaintiff. *Id.* However, in *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind.1991), our supreme court modified the impact rule. The *Shuamber* court determined:

> When ... a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person ... a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

*Id.* Later, in *Keim v. Potter*, 783 N.E.2d 731, 735 (Ind.Ct.App.2003), we held that where "a patient claims emotional damages as a result of alleged medical malpractice, he is sufficiently 'directly involved' to satisfy the modified impact rule."

Here, Tonia can satisfy *Shuamber's* modified impact rule. Tonia was Dr. Brown and DCMH's patient and she alleges that they committed malpractice in their treatment of her. Therefore, pursuant to *Keim*, Tonia was directly involved. Tonia alleges that due to her direct involvement she suffered serious emotional trauma. Tonia's alleged emotional trauma is of a kind and extent that one would normally expect in a reasonable woman who has just suffered a miscarriage.

Dr. Brown contends that if Tonia is able to satisfy *Shuamber's* modified impact rule, then her damages for negligent infliction of emotional distress should be limited to only the emotional damages she suffered as a result of her own injuries and not the emotional distress she felt due to Ray's injuries. Dr. Brown argues that the leading cases on this issue are *Bolin* and *Breece*, and that neither of these cases are clear on what damages a mother can pursue for her own injuries in a case involving the death of a fetus.

In *Bolin*, our supreme court held that Bolin, who suffered a miscarriage due to injuries she received in a car accident, could not bring an action for the wrongful death of her fetus under Indiana's Child Wrongful Death Statute because the child was not born alive; however, the court did state that this did not mean that Bolin was without a remedy. 764 N.E.2d at 207. The court indicated that in this situation " '[t]he mother has her own action for negligently inflicted injury, in which the circumstances of her pregnancy and miscarriage may be brought out and considered as part of the intangible damages.' " *Id.* (quoting *Rambo v. Lawson*, 799 S.W.2d 62, 63 (Mo.1990), *superseded by statute as stated in Connor v. Monkem Co.*, 898 S.W.2d 89 (Mo.1995)). The court then stated:

> It is well established in Indiana law that damages are awarded to compensate an injured party fairly and adequately for her loss, and the proper measure of damages must be flexible enough to fit the circumstances. In tort actions generally, all damages directly related to the wrong and arising without an intervening agency are recoverable.
>
> It is hornbook law that a tortfeasor takes the injured person as he finds her,

and the tortfeasor is not relieved from liability merely because an injured party's pre-existing physical condition makes him or her more susceptible to injury. When some injury was foreseeable and the defendant's negligence proximately caused the aggravated injury, this rule allows recovery for an injury even if its ultimate extent was unforeseeable.

*Id.* at 207–08 (citations omitted). In her complaint, Bolin sought compensation for the pain and suffering she incurred due to the automobile accident. The court held that "[i]t is foreseeable that pregnant mothers may be driving on the roadway and that negligent operation of a vehicle may injure these expectant mothers. [Bolin] may claim damages to compensate her for her miscarriage." *Id.* at 208.

In *Breece,* the mother, Breece, was pregnant with twins, and was in her thirty-sixth week of pregnancy when she began experiencing contractions. Breece went to the hospital where an emergency caesarian section was performed. One of Breece's babies was born healthy, but the other died before delivery. Breece filed a complaint against her healthcare providers seeking damages for the wrongful death of her child under Indiana's Medical Malpractice Act. Breece and her husband also filed claims for negligent infliction of emotional distress. Breece's healthcare providers filed a motion for summary judgment, which the trial court granted. The trial court concluded that Breece could not recover under the Child Wrongful Death Statute for the death of her child, nor could she recover on her negligent infliction of emotional distress claim. On appeal, we first concluded that Breece could not bring a claim for the wrongful death of her child under the Medical Malpractice Act because "the Medical Malpractice Act does not create a new cause of action for the wrongful death of a fetus." *Breece,* 800 N.E.2d at 228.

We then proceeded to consider whether the trial court erred in concluding that Breece was not entitled to pursue a claim for negligent infliction of emotional distress. Breece's healthcare providers argued that we should affirm the trial court's order granting summary judgment in their favor, and, in doing so, that we should also adopt the reasoning expressed in *Smith v. Borello,* 370 Md. 227, 804 A.2d 1151 (2002). We explained that in *Borello,* the Maryland Court of Appeals, the highest court in that state, held that

a pregnant woman who sustains personal injury as a result of a defendant's tortious conduct, and who, as part of that injury, suffers the loss of her unborn child "may recover, in her own action for personal injuries, for any demonstrable emotional distress that accompanies and is attributable to the loss of the fetus." The court held that the emotional distress giving rise to recovery includes distress arising from the unexpected termination of the woman's pregnancy and distress caused by the enduring of a miscarriage or stillbirth.

*Breece,* 800 N.E.2d at 229 (quoting *Borello,* 804 A.2d at 1163 (citations omitted)). The *Borello* court, though, concluded that the mother could only recover for the psychic injury inflicted "and not for her sorrow over the loss of the child. Recovery for that sorrow must be had, if at all, under the wrongful death statute." 804 A.2d at 1163. We then considered our supreme court's opinion in *Bolin.* After comparing *Bolin* and *Borello,* we stated that "[o]ur supreme court did not place the type of restrictions upon recovery that were expressed in *Borello,* and we are of the opinion that we may not impose such restrictions when our State's highest court did not do so." *Breece,* 800 N.E.2d at 230.

We ultimately held that the trial court erred in granting summary judgment "on the issue pertaining to the extent of [Breece's] recovery of intangible damages." *Id.*

Dr. Brown seems to contend that *Bolin* and *Breece* stand for the proposition that the damages that a mother who has suffered a miscarriage due to the negligence of her healthcare providers can pursue should be limited. We disagree. In both *Bolin* and *Breece,* the plaintiffs were allowed to pursue a claim for the intangible damages they incurred due to their suffering a miscarriage. In *Breece,* we explicitly rejected a request from Breece's healthcare providers that we adopt the reasoning in *Borello,* which would have resulted in the imposition of restrictions upon the type of damages a woman who has suffered a miscarriage could pursue. Dr. Brown asks us to adopt the reasoning in *Borello.* For the reasons enunciated in *Breece,* we refuse to adopt *Borello's* reasoning.

■ Our supreme court's views in *Bolin* regarding the damages that a woman who has suffered a miscarriage can pursue are expansive. The court states that "[i]n tort actions generally, all damages directly related to the wrong and arising without an intervening agency are recoverable." *Bolin,* 764 N.E.2d at 207. The court goes on to say that a tortfeasor takes the injured person as he finds her and that when an injury was foreseeable and the defendant's negligence proximately caused the aggravated injury, the plaintiff may recover for the injury even if its ultimate extent was not foreseeable. *Id.* at 207–08. The court held that Bolin could pursue a claim for damages for her miscarriage because "[i]t is foreseeable that pregnant mothers may be driving on the roadway and that negligent operation of a vehicle may injure these expectant mothers." *Id.* at 208. Based on *Bolin* and *Breece,* we believe

that mothers who have suffered a miscarriage may pursue a claim for all intangible damages directly related to their miscarriage.

Here, Tonia alleges that due to the negligence of Dr. Brown and DCMH, she suffered a miscarriage. The miscarriage was an injury to Tonia because it caused her physical condition to deteriorate to the point that she began to suffer from HELLP Syndrome and had to be transferred to Methodist Hospital for further treatment. It is foreseeable that when treating a pregnant woman, she may suffer a miscarriage. Tonia alleges that as a result of her miscarriage she suffered emotional damages. Because Tonia's emotional damages are directly related to her miscarriage, she may pursue her claim for negligent infliction of emotional distress.

Therefore, the trial court erred in granting Dr. Brown and DCMH's motions for summary judgment with regard to Tonia's negligent infliction of emotional distress claim because Tonia can satisfy *Shuamber's* modified impact rule. Furthermore, in her negligent infliction of emotional distress claim, Tonia may recover for all emotional damages that she suffered that are directly related to her miscarriage.

### C. Kevin's Negligent Infliction of Emotional Distress Claim

■ The Ryans also contend that the trial court erred in granting Dr. Brown and DCMH's motions for summary judgment with regard to Kevin's negligent infliction of emotional distress claim. Dr. Brown and DCMH argue that summary judgment was proper because Kevin cannot satisfy the requirements of the "bystander" rule enunciated by our supreme court in *Groves v. Taylor,* 729 N.E.2d 569 (Ind.2000).

As we have already stated, traditionally, in order to bring a claim for negligent

infliction of emotional distress, a plaintiff had to satisfy the "impact" rule. *Blackwell,* 771 N.E.2d at 695. Our supreme court modified the impact rule in *Shuamber.* 579 N.E.2d at 456. Kevin cannot satisfy *Shuamber's* modified impact rule because he has not suffered a direct impact. However, in *Groves,* our supreme court extended *Shuamber's* modified impact rule. In *Groves,* an eight-year-old girl witnessed her six-year-old brother being struck and killed by a passing police car. The eight-year-old girl filed a claim for negligent infliction of emotional distress, but could not satisfy *Shuamber's* modified impact rule because she had not suffered a direct impact. The court observed:

> Given that the prevention of merely spurious claims is the rationale for the *Shuamber* rule, logic dictates that there may well be circumstances where, while the plaintiff does not sustain a direct impact, the plaintiff is sufficiently directly involved in the incident giving rise to the emotional trauma that we are able to distinguish legitimate claims from the mere spurious.

*Groves,* 729 N.E.2d at 572. The court held that

> where the direct impact test is not met, a bystander may nevertheless establish "direct involvement" by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise tortuous conduct.

*Id.* at 573.

Dr. Brown and DCMH first argue that Kevin cannot satisfy *Groves'* "bystander" rule because he did not witness the death of a loved one. Although Kevin did not witness the death of his son Ray, Kevin did come on the scene soon after Ray's death. This is sufficient to satisfy the "bystander" rule. Dr. Brown and DCMH also argue that in order to satisfy the "bystander" rule, Kevin must have witnessed a horrible, shocking, extraordinary event which caused the death of a loved one, and, because Kevin did not witness such an event, he cannot recover for his emotional damages. However, the "bystander" rule, as enunciated in *Groves,* does not require that a plaintiff witness a horrible, shocking, or extraordinary event. *Groves* only requires that the plaintiff witness or come on the scene soon after the death or severe injury of a loved one. Here, Kevin came on the scene soon after Ray's death.

Dr. Brown and DCMH also point out that in *Groves,* the court stated that " '[w]itnessing either an incident causing death or serious injury or the gruesome aftermath of such an event minutes after it occurs is an extraordinary experience, distinct from the experience of learning of a' loved one's death or severe injury by indirect means." *Id.* (quoting *Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis.2d 627, 517 N.W.2d 432, 444–45 (1994)). Dr. Brown and DCMH point out that Kevin did not witness Ray's death and only learned about it indirectly when Dr. Brown told him what had happened to Ray. Although Kevin did first learn of Ray's death from Dr. Brown, he also witnessed the gruesome aftermath of Ray's death. After Dr. Brown told Kevin that Ray had died, Kevin had to tell Tonia of their son's death. Kevin was present when Dr. Brown unsuccessfully tried to induce labor. Kevin was with Tonia as her physical condition began to deteriorate and she began to experience HELLP Syndrome. Kevin rode with Tonia in the ambulance as she was transferred to Methodist Hospital. Kevin was present when Ray was finally

delivered and was given the opportunity to hold his dead son with his wife. Therefore, we conclude that because Kevin came on the scene soon after the death of his son Ray, Kevin can satisfy the "bystander" rule and is entitled to pursue a claim for negligent infliction of emotional distress.

This conclusion is supported by our supreme court's decision in *Bader*. In that case, Connie Johnson gave birth to a child suffering from hydrocephalus and multiple birth defects. The child died four months after its birth. Connie and her husband Ronald filed a complaint against her doctor, Dr. Patricia Bader, alleging she committed negligence by failing to inform the Johnsons of the results of an ultrasound test that revealed that the baby had birth defects. Both Ronald and Connie sought damages for the emotional distress they experienced. The trial court denied Dr. Bader's motion for summary judgment on Ronald and Connie's emotional distress claims, but, on appeal, we reversed. *Bader v. Johnson*, 675 N.E.2d 1119, 1127 (Ind. Ct.App.1997).

On transfer, our supreme court reversed our decision with regard to Ronald's claim for emotional damages. *Bader*, 732 N.E.2d at 1222. Although Ronald did not suffer a direct impact, the court stated that Ronald was a relative bystander under *Groves*. *Id.* The court concluded that "whether Ronald can prevail on his claim for emotional distress damages depends on the evidence adduced at trial." *Id.* Like Ronald Johnson, Kevin did not suffer a direct impact from the death of his son but he does qualify as a relative bystander under *Groves*. Thus, *Bader* suggests that Kevin's negligent infliction of emotional distress claim should survive Dr. Brown and DCMH's motions for summary judgment.

Our conclusion that Kevin's claim for negligent infliction of emotional distress should survive summary judgment is further supported by our decisions in *Blackwell* and *Delta Airlines v. Cook*, 816 N.E.2d 448 (Ind.Ct.App.2004), *trans. pending*. In *Blackwell*, the Blackwells' son died in 1987, and the Blackwells had his body cremated. The Blackwells then requested that their son's remains be entombed in a glass niche at Graceland Cemetery. In 1999, the Blackwells learned that their son's remains had not been entombed at Graceland Cemetery and they filed a claim for negligent infliction of emotional distress. The cemetery filed a motion for summary judgment on the Blackwells' negligent infliction of emotional distress claims, which the trial court granted.

On appeal, we noted that the Blackwells sought emotional damages under *Groves* as relative bystanders. We pointed out that although *Groves'* "bystander" rule may be inapposite, the supreme court's reasoning in *Groves* was still persuasive and compelling. *Blackwell*, 771 N.E.2d at 697. We stated that "while there was no physical impact, the Blackwells have alleged serious emotional trauma and it is of a kind that a reasonable person would experience." *Id.* We went on to explain that

[i]n our view, this is the type of claim that our supreme court spoke of in *Groves* where the plaintiff is sufficiently and directly involved in the incident giving rise to the emotional trauma. The rationale underlying the impact rule that prevents concocted claims of mental anguish is not implicated here. We are satisfied that the evidence designated to the trial court in this case is such that the alleged mental anguish suffered by the Blackwells is not likely speculative, exaggerated, fictitious, or unforeseeable.

*Id.* (citation omitted). We determined that provided that the Blackwells could prevail

on their negligence claim, there was no reason why they should not be allowed to claim damages for emotional distress. *Id.* Therefore, we concluded that the trial court erred in granting the cemetery's motion for summary judgment, and that the Blackwells' claim for negligent infliction of emotional distress should be permitted to proceed. *Id.*

In *Cook*, the Cooks were aboard a Delta Airlines flight from Indianapolis to New York City several months after the September 11, 2001, attacks on the World Trade Center. A passenger aboard the flight, Frederic Girard, a French national, was behaving erratically. On one occasion, Bryan Cook and two other male passengers had to block Girard's attempts to move towards the front of the plane. The flight eventually made an emergency landing in Cleveland, where Girard was arrested. The Cooks brought a claim for negligent infliction of emotional distress against Delta. Delta filed a motion for summary judgment with regard to the Cooks' negligent infliction of emotional distress claims, but the trial court denied that motion.

On appeal, we affirmed the trial court. *Cook*, 816 N.E.2d at 460. We noted that the Cooks were directly involved in the incident involving Girard's erratic behavior aboard the flight to New York City. *Id.* We determined that we could not say as a matter of law that the Cooks' claimed emotional injuries were not serious in nature and of a kind and extent normally expected to occur in a reasonable person under similar circumstances. *Id.* We concluded that the Cooks were entitled to present their emotional damages claims to a trier of fact, and that the trial court properly denied Delta's motion for summary judgment on this issue. *Id.* On rehearing, we reaffirmed our opinion and reiterated that "the focus should be on whether the Cooks allege emotional injuries that are 'serious

in nature and of a kind and extent normally expected to occur in a reasonable person' under the circumstances, not whether any physical impact occurred." *Delta Airlines v. Cook*, 821 N.E.2d 400, 403 (Ind.Ct. App.2005).

Here, as in *Blackwell* and *Cook*, Kevin was directly involved in Tonia's miscarriage and the death of his son Ray. Kevin is Tonia's husband and the father of Ray. Kevin was with Tonia when Dr. Brown advised her to admit herself to DCMH. Kevin helped Tonia get admitted to DCMH. Kevin later had to leave work and go to DCMH where Dr. Brown told him that Ray had died. Kevin then had to tell Tonia that Ray was dead. Kevin was present when Dr. Brown unsuccessfully tried to induce labor. Kevin witnessed Tonia's physical condition deteriorating and was aware that she was beginning to suffer from HELLP Syndrome. Kevin rode with Tonia in an ambulance when she was transferred to Methodist Hospital. Kevin was present when Ray was delivered and he was given the chance to hold Ray.

Furthermore, although Kevin has not suffered a physical impact, he has alleged serious emotional trauma and it is of a kind that a reasonable person would be expected to experience under the circumstances. We are satisfied that the evidence designated to the trial court here is such that the alleged emotional distress suffered by Kevin is not likely speculative, exaggerated, fictitious, or unforeseeable. Therefore, the trial court erred in granting Dr. Brown and DCMH's motions for summary judgment with regard to Kevin's negligent infliction of emotional distress claim because Kevin can satisfy the "bystander" rule and because he has alleged serious emotional trauma that is of a kind and extent normally expected to occur in a

reasonable person under similar circumstances.

## Conclusion

The trial court properly granted Dr. Brown and DCMH's motions for partial summary judgment with regard to the Ryans' wrongful death claim under the Medical Malpractice Act because the Medical Malpractice Act does not create a separate cause of action for the wrongful death of a fetus. The trial court erred in granting summary judgment on Tonia's negligent infliction of emotional distress claim because Tonia can satisfy the modified impact rule enunciated in *Shuamber*. We also hold that the trial court erred in granting summary judgment on Kevin's negligent infliction of emotional distress claim because Kevin can satisfy the "bystander" rule enunciated in *Groves* and because he has alleged serious emotional trauma that is of a kind and extent normally expected to occur in a reasonable person under similar circumstances. Therefore, the portion of the trial court's order granting summary judgment on the Ryans' wrongful death claim under the Medical Malpractice Act is affirmed, while the portion of the trial court's order granting summary judgment on Tonia and Kevin's negligent infliction of emotional distress claims is reversed.

Affirmed in part, reversed in part, and remanded for further proceedings.

SHARPNACK, J., and BARNES, J., concur.