# FOR PUBLICATION



FILED
Nov 14 2014, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAMES A. MELLOWITZ**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**W. BRENT THRELKELD**
**KELLY A. ROTH**
Threlkeld & Associates
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

RAY CLIFTON,      )
     )
     Appellant-Plaintiff,      )
     )
     vs.      )    No. 49A02-1404-CT-276
     )
RUBY MCCAMMACK,      )
     )
     Appellee-Defendant.      )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-1305-CT-22085

**November 14, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Ray Clifton appeals the trial court's order granting summary judgment in favor of defendant Ruby McCammack. Clifton raises five issues, which we consolidate and restate as whether the court erred in granting summary judgment. We reverse and remand.[1]

FACTS AND PROCEDURAL HISTORY

In August 2012, Clifton, who was born in 1932, was living with his fifty-one year old son Darryl in Indianapolis, Indiana. Clifton and Darryl were "extremely close," and Darryl cared for Clifton after back surgery in February, 2012. Appellant's Appendix at 36. Around 11:15 a.m. on August 3, 2012, Darryl left the home on his moped, and soon after he was involved in an accident when he collided with a vehicle driven by McCammack while she was pulling out of an intersection and turning left. Darryl was killed as a result of the accident. A report filed by Officer Jason Rakaska of the Indianapolis Metropolitan Police Department notes that the accident occurred at approximately 11:28 a.m., and Darryl's death certificate lists his time of death at 11:43 a.m. Soon after, at around noon, Clifton saw "breaking news" on his TV of "a motorbike fatality in the 3300 block of Kentucky Avenue." Id. at 32. The news report did not contain any photographs or video footage of the crash scene. Clifton "had a very bad feeling" because he "knew Darryl had just left on his motorbike" and that Kentucky Avenue was "the route he always took to go in town," and Clifton "definitely was upset." Id. Darryl had been driving into town "about every day, on some kind of scout work."

---

[1] We heard oral argument in this case on October 14, 2014, at Pike Central High School in Petersburg, Indiana. We wish to thank counsel for their advocacy and extend our appreciation to the faculty, staff, and students of Pike Central High School for their hospitality.

Id. Following the news segment, which lasted about a minute, Clifton left "as quick as [he] could" in his car and drove to the scene of the accident. Id.

Clifton arrived at the scene about six or seven minutes after leaving the house and observed "a lot of police cars, a lot of people," and he pulled into a Speedway Gas Station. Id. After exiting the vehicle, he approached a few policemen and observed at a distance of about twenty to twenty-five feet a body covered by a white sheet with shoes "sticking out from under the blanket" and a moped, both of which he recognized as Darryl's, and Clifton "knew it had to be him." Id. at 33. McCammack's car was still situated at the scene where it had collided with Darryl. Clifton spoke with an officer and stated that he believed the decedent was his son, and the officer took him to a nearby Arby's to talk. The officer called for a chaplain on Clifton's behalf, and a woman at Arby's spoke with Clifton and said that she prayed with Darryl following the accident and that Darryl "lived about a minute." Id. at 34. Clifton kept repeating "Why? Why? Why?" Id. He observed an ambulance arrive but did not see Darryl being loaded into the ambulance. After about two hours, Clifton's minister and the minister's wife arrived at the Arby's, and they all went back to Clifton's house.

On May 28, 2013, Clifton filed a complaint for damages against McCammack alleging that she was liable for negligent infliction of emotional distress and the associated damages caused by that distress. On July 19, 2013, McCammack timely filed her answer wherein she admitted negligence causing the death of Darryl, noted that she was without sufficient information to admit or deny allegations regarding Clifton learning of the accident, and denied the allegation that she negligently inflicted emotional distress

3

on Clifton. On September 19, 2013, McCammack served her responses to Clifton's Request for Admissions and Interrogatory in which she admitted negligence for the accident but denied that she caused Clifton emotional distress. On August 22, 2013, Clifton was deposed and testified that he believed when he came upon the scene that Darryl's moped "was right up by the front fender and front wheel, on the driver side" and was "against the car." Id. at 33.

On December 11, 2013, McCammack filed a motion for summary judgment, along with a memorandum of law in support of her motion and designation of evidence, arguing that Clifton's claim for negligent infliction of emotional distress did not meet the requirements of the bystander rule. McCammack designated as Exhibit D her affidavit in which she stated that immediately following the impact the moped remained upright and Darryl's body was leaned against the driver's side door, that shortly thereafter certain witnesses lifted Darryl off of the vehicle and laid him on the pavement, and that the witnesses also moved the moped away from the vehicle and laid it on the pavement a short distance away.

On January 31, 2014, Clifton timely filed his Brief in Opposition to Defendant's Motion for Summary Judgment, and his own Request for Summary Judgment. On February 28, 2014, McCammack filed her Reply to Plaintiff's Brief in Opposition to her Motion for Summary Judgment and her Response Brief to Plaintiff's Motion for Summary Judgment. She also filed a Motion to Strike Exhibit A-2 of Plaintiff's Designation of Exhibits, consisting of a hand-written vehicle crash witness statement completed by Rhonda L. Thompson. On March 20, 2014, Clifton filed his Motion for

4

Leave to File Supplemental Affidavits, and his Objection to McCammack's Motion to Strike. The supplemental affidavits were of two crash witnesses, including Rhonda Thompson and Richard Clevenger, establishing that Darryl Clifton was alive immediately after the crash. On April 9, 2014, the trial court granted Clifton's motion allowing him to file the two supplemental affidavits and denied McCammack's Motion to Strike.

On April 14, 2014, the court heard oral argument on the motions for summary judgment. On April 15, 2014, the trial court issued its Order Granting McCammack's Motion for Summary Judgment which stated as follows:

> Defendant, Ruby McCammack, by counsel, filed her Motion for Summary Judgment, and Plaintiff, Ray Clifton, by counsel, filed his Brief in Opposition thereto. The Court having conducted a hearing and being duly advised in the premises, now finds that there is no genuine issue as to any material fact, and that the Defendant is entitled to summary judgment as a matter of law. The Court finds that the undisputed facts establish that Plaintiff fails to meet the temporal and circumstantial requirements to permit recovery for negligent infliction of emotion [sic] distress as set forth in Smith v. Toney, 862 N.E.2d 656 (Ind. 2007). The Court further expressly finds that there is no just reason for delay for the entry of final judgment.
>
> IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of the Defendant, Ruby McCammack, and against the Plaintiff, Ray Clifton, and that final judgment is entered pursuant to Rule 54(B) of the Indiana Rules of Trial Procedure.

Id. at 163.

## ISSUE / STANDARD OF REVIEW

The issue is whether the court erred in granting summary judgment in favor of McCammack. We review a trial court's order granting summary judgment de novo. Alldredge v. Good Samaritan Home, Inc., 9 N.E.3d 1257, 1259 (Ind. 2014). We apply

5

the same standard as the trial court: summary judgment is appropriate only where the moving party demonstrates there is no genuine issue of material fact and he is entitled to judgment as a matter of law. Id.; see also Ind. Trial Rule 56(C). If the moving party carries his burden, the non-moving party must then demonstrate the existence of a genuine issue of material fact in order to survive summary judgment. Id. Just as the trial court does, we resolve all questions and view all evidence in the light most favorable to the non-moving party, so as to not improperly deny him his day in court. Id. Our review of a summary judgment motion is limited to those materials designated to the trial court. Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. Catt v. Bd. of Comm'rs of Knox Cnty., 779 N.E.2d 1, 3 (Ind. 2002). To the extent that the parties filed cross-motions for summary judgment, this fact does not alter our standard of review and instead we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Sterling Commercial Credit-Mich., LLC v. Hammert's Iron Works, Inc., 998 N.E.2d 752, 756 (Ind. Ct. App. 2013).

## DISCUSSION

The tort for negligent infliction of emotional distress traditionally required that the person claiming emotional injuries may recover damages "only when the distress is accompanied by and results from a physical injury caused by an impact to the person seeking recovery." Shuamber v. Henderson, 579 N.E.2d 452, 454 (Ind. 1991). In Shuamber, however, the Indiana Supreme Court abrogated the traditional "impact rule"

6

and extended the tort to "instances where the distress is the result of a physical injury negligently inflicted on another." Id. at 455. The Shuamber rule, sometimes referred to as the "modified impact rule," allows for negligent infliction of emotional distress claims in such cases:

> When . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person . . . a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

Id. at 456.

The Indiana Supreme Court again extended the scope of who may bring a claim for negligent infliction of emotional distress in Groves v. Taylor, 729 N.E.2d 569 (Ind. 2000). In Groves, the Court noted that "it is undisputed that the plaintiff did not suffer the kind of direct impact required by Shuamber to recover as a bystander for emotional distress." Groves, 729 N.E.2d at 572. The Court explained that "[t]he value of requiring 'direct impact' is that it provides clear and unambiguous evidence that the plaintiff was so directly involved in the incident giving rise to the emotional trauma that it is unlikely that the claim is merely spurious," but that "there may well be circumstances where, while the plaintiff does not sustain a direct impact, the plaintiff is sufficiently directly involved in the incident giving rise to the emotional trauma that we are able to distinguish legitimate claims from the mere spurious." Id. The Court discussed and adopted the reasoning of a case from the Wisconsin Supreme Court, Bowen v. Lumbermens Mut. Cas. Co., 517 N.W.2d 432 (Wis. 1994), which observed that negligent infliction of

7

emotional distress claims have historically raised two concerns: "(1) establishing the authenticity of the claim and (2) ensuring fairness of the financial burden placed upon a defendant whose conduct was negligent." Id. (quoting Bowen, 517 N.W.2d at 443). The Wisconsin Court identified three factors which "taken together, help assure that the claim in this case is genuine [and] that allowing recovery is not likely to place an unreasonable burden upon the defendant," id. (quoting Bowen, 517 N.W.2d at 444), and which the Groves Court formulated as follows:

> First, "[a] fatal injury or a physical injury that a reasonable person would view as serious can be expected to cause severe distress to a bystander. Less serious physical harm to a victim would not ordinarily result in severe emotional distress to a reasonable bystander of average sensitivity." [Bowen, 517 N.W.2d at 444].

> Second, emotional distress may accompany the death or severe injury of persons such as friends, acquaintances, or passersby. But the emotional trauma that occurs when one witnesses the death or severe injury of a loved one with a relationship to the plaintiff analogous to "a spouse, parent, child, grandparent, grandchild, or sibling is unique in human experience and such harm to a plaintiff's emotional tranquility is so serious and compelling as to warrant compensation." Id. (footnote omitted). Limiting recovery to those plaintiffs who have the specified relationships with the victim acknowledges the special quality of such relationships yet places a reasonable limit on the liability of the tortfeasor. Id.

> Third, "[w]itnessing either an incident causing death or serious injury or the gruesome aftermath of such an event minutes after it occurs is an extraordinary experience, distinct from the experience of learning of a" loved one's death or severe injury by indirect means. Id. at 444-45.

Id. at 572-573. The Court declared, in what is known as the "bystander rule," that:

> [W]here the direct impact test is not met, a bystander may nevertheless establish 'direct involvement' by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent,

8

child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise tortuous [sic] conduct.

Id. at 573.

The Court next discussed the bystander rule in Smith v. Toney, 862 N.E.2d 656 (Ind. 2007). The Smith case came to the Court as a certified question from the United States District Court for the Southern District of Indiana in which the Court was asked to address the following:

> 1. Under the test elaborated in Groves v. Taylor for bringing a bystander claim of negligent infliction of emotional distress, are the temporal and relationship determinations regarding whether a plaintiff "actually witnessed or came on the scene soon after the death of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling" issues of law or fact, or are they mixed questions of law and fact?
>
> 2. If an issue of law, is a fiancée an "analogous" relationship as used in Groves and is "soon after the death of a loved one" a matter of time alone or also of circumstances?

862 N.E.2d at 657.

In Smith, Eli Welch and his fiancée Amy Smith fell asleep watching television at the home of Smith and her parents, and at approximately 3:30 a.m. Smith awoke and told Welch he needed to go home. Id. at 658. Welch told Smith that he would call her when he arrived at his house and left, and Smith fell back to sleep. Id. As Welch was driving home, his car collided with a tractor-trailer. Id. An emergency response team was dispatched to the scene of the accident at 3:53 a.m., and Welch was declared a fatality at 4:05 a.m. Id. Welch's body was extricated from his vehicle between 5:50 and 5:55 a.m.,

9

was immediately placed in a body bag, and was then moved to the coroner's vehicle.  Id.  The response team left the scene of the accident between 6:06 and 6:08 a.m.  Id.

Around 5:30 a.m., Smith awoke and realized that Welch had not called her.  Id.  She called Welch's home and cell phone but received no response.  Id.  She left her house at approximately 6:00 a.m., drove the route Welch normally took to his house, and came upon the scene of the accident.  Id.  She remembered seeing Welch's "smashed up" vehicle and police officers standing by.  Id.  She slowed her car as she drove by the scene, but she did not stop or speak to anyone.  Id.  Smith called Welch's sister's house at 6:14 a.m., which, according to her, was immediately placed after she came upon the accident scene, and spoke with Welch's brother-in-law.  Id.  Smith had no present recollection of seeing any part of Welch's body when she came upon the scene of the accident, but she testified that Welch's brother-in-law told her that during their phone conversation she told him that she saw Welch's hand.  Id.  Smith drove from the scene to Welch's sister house, where she learned of Welch's death before 7:07 a.m.  Id.

On appeal, the Court began by concluding that "both the relationship and proximity requirements under Groves are issues of law."  Id.  The Court observed in doing so that this conclusion was consistent with the Wisconsin Supreme Court's pronouncements in Bowen.  Id. at 659-660.  The Court proceeded to address "the questions of (1) whether a fiancée is an 'analogous' relationship as that term is used in Groves and (2) whether 'soon after the death of a loved one' is a matter of time alone or also of circumstances."  Id. at 660.  Regarding the first question, the Court declined to find the relationship of two people engaged to be married as a relationship "'analogous to

10

a spouse' under Groves," observing that marriage affords "a bright line and is often adopted by the legislature in defining permissible tort recovery" and "avoids the need to explore the intimate details of a relationship that a claimant asserts is 'analogous' to marriage," and also limits "defendants' liability . . . to . . . the array of persons to whom a negligent defendant is potentially liable." Id. at 660-662.

The Court proceeded to address whether the proximity requirement of the bystander rule – whether a plaintiff "came on the scene soon after the death of a loved one – is a matter of time alone or also of circumstances." Id. at 662. The Court concluded that the proximity requirement was indeed both a matter of time and circumstances, noting that the Groves court "essentially followed Bowen in adopting" the bystander rule, that Bowen "expressed the limitations as permitting recovery only by claimants who witnessed the accident or experienced the 'gruesome aftermath' of the accident 'minutes' after the accident occurred with the victim at the scene," and that Bowen "explained that drawing a line was necessary because witnessing such an incident was 'distinct' from learning of a victim's death or injury indirectly." Id. (quoting Bowen, 517 N.W.2d at 445). The Court concluded as follows:

> Subsequent cases discussing this Bowen requirement noted that emotional trauma arising from learning of a loved one's death through indirect means could be devastating but also observed that every person could be expected at some point to learn of the death or serious injury of a loved one through indirect means. "Bystander" claims are not meant to compensate every emotional trauma. Rather they are limited to those that arise from the shock of experiencing the traumatic event. Finnegan ex. rel. Skoglind v. Wis. Patients Comp. Fund, 263 Wis.2d 574, 666 N.W.2d 797, 805 (2003); Rosin v. Fort Howard Corp., 222 Wis.2d 365, 588 N.W.2d 58, 61-62 (Wis. Ct. App. 1998). These cases pointed out that this temporal requirement guaranteed the genuineness of the claim and assured that recovery would

11

not unreasonably burden the defendant—the two major public policy concerns of "bystander" claims set forth in <u>Bowen</u>. <u>Finnegan</u>, 666 N.W.2d at 802-03; <u>Rosin</u>, 588 N.W.2d at 61. In <u>Groves</u> the facts were such that one who arrived "soon" after the accident necessarily viewed "the gruesome aftermath." But we think the requirement of bystander recovery is both temporal—at or immediately following the incident—and also circumstantial. The scene viewed by the claimant must be essentially as it was at the time of the incident, the victim must be in essentially the same condition as immediately following the incident, and the claimant must not have been informed of the incident before coming upon the scene.

<u>Id.</u> at 662-663.

Clifton begins by noting that limitations on bystander claims "are designed to allow legitimate claims, while preventing illegitimate and spurious claims." Appellant's Brief at 9. Clifton discusses <u>Blackwell v. Dykes Funeral Homes, Inc.</u>, 771 N.E.2d 692 (Ind. Ct. App. 2002), <u>reh'g</u> <u>denied</u>, <u>trans.</u> <u>denied</u>, and argues that the rule of that case "stressed that the <u>relevant inquiry is whether the evidence indicates a legitimate claim</u> that is not spurious" when it allowed emotional distress damages despite the plaintiffs not meeting the three-part bystander test. <u>Id.</u> at 11 (discussing <u>Blackwell</u>, 771 N.E.2d at 693-694, 697).[2] Clifton also cites to <u>Ryan v. Brown</u>, 827 N.E.2d 112 (Ind. Ct. App. 2005), for

---

[2] We note that the Indiana Supreme Court has cast doubt on whether <u>Blackwell</u> should be considered persuasive authority. First, in <u>Atl. Coast Airlines v. Cook</u>, 857 N.E.2d 989 (Ind. 2006), following the declaration that "in order to recover damages for the negligent infliction of emotional distress, a plaintiff must satisfy either the modified impact rule or the bystander rule," 857 N.E.2d at 998, the Court included the following footnote: "But <u>see</u> . . . <u>Blackwell</u> . . . (permitting parents to pursue damages for emotional distress for the loss of son's cremated remains although there was no physical impact and the elements for the bystander exception were not met)." <u>Id.</u> at 998 n.8. Also, in <u>Spangler v. Bechtel</u>, 958 N.E.2d 458, 465 n.4 (Ind. 2011), the Court observed in a footnote that "[s]ince our adoption of the 'bystander rule' . . . our colleagues on the Court of Appeals have urged us on multiple occasions to abandon the modified impact and bystander rules altogether in favor of a general test of 'direct involvement,'" and the Court cited <u>Blackwell</u> and summarized its holding as follows: "[P]laintiffs could maintain an action for emotional distress against a funeral home that mishandled the remains of the plaintiffs' child even though 'no physical impact occurred' because 'the alleged mental anguish . . . is not likely speculative, exaggerated, fictitious, or unforeseeable.'" <u>Id.</u> The court concluded its footnote by stating that "[a] pure foreseeability rule is 'unsatisfactory because genuine emotional disturbance can

the proposition that the bystander rule "does not require that a plaintiff witness a horrible, shocking, or extraordinary event" and "only requires that the plaintiff witness or come on the scene soon after the death of a severe injury of a loved one." Id. at 12 (quoting Ryan, 827 N.E.2d at 122). Clifton also discusses Smith v. Toney and argues that statements in that case support the proposition that the claimant need not actually witness the incident but "must not have been informed of the incident before coming upon the scene." Id. at 13 (quoting Smith, 862 N.E.2d at 663).

Clifton argues that his bystander claim is "legitimate" and that the "evidence shows he suffered severe emotional distress from learning of his son's death, and finding him dead in the street, when [he] came upon the scene of a traffic collision." Id. He argues that his claim is within the bystander rule as espoused in Groves, Blackwell, and Ryan. He asserts that he "had sufficient 'direct involvement' in Darryl's death" under Groves when "[h]e came on the scene . . . 23 minutes after his death." Id. at 15. He maintains that "[t]he evidence is undisputed that [he] did not know, at any time before he came on the crash scene, that his son was involved in this fatal crash" and that he was only "worried about his son after seeing a television news bulletin." Id. He argues that he "did not know where his son was going when he left home" and "did not know whether he was involved in a crash, much less killed, at the time that [he] drove to the crash scene." Id. at 15-16 n.4. Clifton further argues that his claim "meets the dicta

occur and is foreseeable in many situations in which courts clearly would not permit recovery,'" that "[a] general standard of 'direct involvement' would not be any more precise," and that they "have found no other comprehensive uniform principle capable of satisfactorily reflecting the range of circumstances where liability for emotional distress is appropriate." Id.

13

requirements of <u>Smith v. Toney</u> because the crash scene was essentially unchanged when its gruesome aftermath was viewed by Clifton" and "[t]o argue otherwise is to elevate form over substance . . . ."[3] <u>Id.</u> at 16. He asserts that when he "arrived at the scene . . . at 12:06 or 12:07 p.m., it was essentially unchanged from the time of the crash (11:28 a.m.) and from the time of his son's death (11:43 a.m.)." <u>Id.</u> at 17. He states that Darryl's body was laying in the street next to McCammack's damaged automobile, which was in the same position it was in at impact, and the moped "was 'right up by the front fender and front wheel, on the driver side' and 'might have been laid right up against the side of the car'" before being "moved a few feet away from the car and laid on its side" after he arrived at the scene. <u>Id.</u>

McCammack argues that "Clifton is asking the court to expand the scope of the bystander rule to allow recovery for negligent infliction of emotional distress without witnessing either the accident itself or any of the injuries or resulting death." Appellee's Brief at 9. She notes that the Indiana Supreme Court in <u>Smith</u> stated that "bystander claims are 'not meant to compensate every emotional trauma. Rather they are limited to those that arise from the shock of experiencing the traumatic event.'" <u>Id.</u> at 12 (quoting <u>Smith</u>, 862 N.E.2d at 663). She cites to the following text from <u>Bowen</u> as follows:

> Witnessing either an incident causing death or serious injury or the gruesome aftermath of such an event minutes after it occurs is an extraordinary experience, distinct from the experience of learning of a

---

[3] Clifton asserts that the discussion in <u>Smith</u> of the bystander rule's proximity requirement is *dicta* because the Court, having determined that a fiancée relationship was not an "analogous relationship" under the bystander rule, did not need to reach the question of whether the proximity requirement found in <u>Groves</u> that the claimant must arrive "soon after the death of a loved one" is a matter of time alone or also of circumstances.

14

family member's death through indirect means. Thus it is an appropriate place to draw the line between recoverable and non-recoverable claims.

Bowen, 517 N.W.2d at 444-445.[4]

McCammack asserts that "Clifton cannot prove the essential element of fortuity . . . because he did not witness the accident that resulted in his son's death, nor did he come upon the scene unaware within minutes of the accident and witness the gruesome aftermath." Id. at 13. She notes that Clifton believed Darryl may have been involved after the news report and was experiencing distress prior to leaving the residence. McCammack maintains that although Clifton argues that "he did not 'know' that his son was dead when he left," Smith is clear that the plaintiff "must not have learned of the **incident**." Id. at 14. She argues that this court's holding in Johnson v. Marion Cnty. Coroner's Office, 971 N.E.2d 151 (Ind. Ct. App. 2012), trans. denied, is applicable where it held that the plaintiff was not entitled to damages based on the bystander rule in part "because he voluntarily exposed himself to these actions," including moving the body of his mother, who was obese, "via less than traditional means," when "he returned to the apartment after having left it upon the paramedics' arrival." Id. at 16 (quoting Johnson, 971 N.E.2d at 161-162). McCammack also argues that Clifton's claim fails because "both the accident scene and the condition of [Darryl] were not essentially the same when Clifton arrived on the scene." Id. at 17. McCammack lists among the conditions that had changed by the time Clifton arrived at the scene that emergency workers were not

---

[4] We note that McCammack in her brief attempts to quote the above language from Bowen; however, the text contained in her brief contains multiple differences from the actual language found in Bowen. We include the quoted text as it appears in Bowen.

15

administering treatment to Darryl, who was covered by a sheet, and that the moped had been moved off of the vehicle a short distance.

In his reply brief, Clifton argues that McCammack misstates certain facts in her brief, including that: (1) "Clifton 'believed' . . . Darryl 'was involved'" where his deposition testimony "makes clear that while [he] worried that his son might have been a victim . . . he did not know him to be involved . . . until [he] arrived at the crash scene" and accordingly "did not learn of Darryl's death through 'indirect means;'" (2) his deposition and affidavit testimony states that the moped "was right up next to McCammack's automobile at the time he arrived on the scene," which was corroborated by Rhonda Thompson in her affidavit, and that this evidentiary conflict must be resolved in his favor; and (3) the timeframe in which the events occurred. Reply Brief at 2-3. He also argues that McCammack's reading of Smith v. Toney is incorrect in that it characterizes the relevant portion as the holding, but in fact that portion "was not necessary to the determination of the case and constitutes non-binding *obiter dictum*." Id. at 3. He further asserts that McCammack "admits there is 'no dispute that actual, legitimate grief occurred'" and thus "[t]he public policy underlying the law on bystander claims is well served by allowing [his] claim . . . ." Id. at 5. Finally, Clifton argues that the rule in Johnson is inapplicable because the plaintiff in that case "knew his mother had died and had already seen her dead body, before exposing himself to the removal of her body." Id. at 6.

16

DECISION

The Court in <u>Smith</u> held in answering the first certified question that "both the relationship and proximity requirements under <u>Groves</u> are issues of law." 862 N.E.2d at 658. Thus, whether Clifton's claim for damages may proceed under the bystander rule is for the court to decide. Also, to the extent that Clifton invites this court to not apply the applicable language in <u>Smith</u> concerning the Court's analysis of the second certified question to the instant facts, suggesting that such discussion was "*obiter dictum*," we decline his invitation.

As noted above, it is undisputed that the relationship between Clifton and decedent Darryl satisfies the bystander rule's relationship requirement and that McCammack was negligent when she caused Darryl's death. It is also undisputed that Clifton did not "actually witness" Darryl's death. Thus, the question presented is whether the circumstances surrounding Clifton's coming on the scene of Darryl's death satisfies the proximity requirement of the bystander rule.

Again, <u>Smith</u> discussed the bystander rule's proximity requirement and noted that it was a matter of both time and circumstances and cited to <u>Bowen</u> for the proposition that the rule limits recovery to "claimants who witnessed the accident or experienced the 'gruesome aftermath' of the accident 'minutes' after the accident occurred with the victim at the scene," which "was 'distinct' from learning of a victim's death or injury indirectly." 862 N.E.2d at 662 (quoting <u>Bowen</u>, 517 N.W.2d at 445). The court stated specifically:

17

[T]he requirement of bystander recovery is both temporal—at or immediately following the incident—and also circumstantial. The scene viewed by the claimant must be essentially as it was at the time of the incident, the victim must be in essentially the same condition as immediately following the incident, and the claimant must not have been informed of the incident before coming upon the scene.

Id. at 663. Thus, under Smith, analyzing the proximity requirement of the bystander rule when the claimant comes on the scene "soon after the death of a loved one" involves two prongs which are: (1) temporal; and (2) circumstantial.

First, regarding the temporal prong, the question is whether, when Clifton arrived at the scene of the crash, it was "essentially as it was at the time of the incident, [and that Darryl was] in essentially the same condition as immediately following the incident." Id. The parties' arguments regarding the temporal prong relate to whether the time that elapsed between the accident and Clifton's arrival was a matter of minutes after the accident occurred, and whether the crash scene had been altered to the point that Clifton did not view the gruesome aftermath.

The accident between Darryl and McCammack occurred at approximately 11:28 a.m. The affidavits of Rhonda Thompson and Richard Clevenger state that Darryl did not die immediately after the crash and that he was "making gurgling sounds." Appellant's Appendix at 152. Clifton was told by a woman at the scene that she prayed with Darryl following the accident and that he "lived about a minute." Id. at 34. Darryl's death certificate notes the time of death as 11:43 a.m. Clifton saw the news report at around noon and left his home "as quick as [he] could" to drive to the scene. Id. at 32. The drive took approximately six or seven minutes. Thus, Clifton arrived at the scene

18

approximately forty minutes following the accident and approximately twenty-five minutes after Darryl passed away. We believe this time period satisfies the time prong of Clifton's bystander claim.

Regarding the state of the crash scene when Clifton arrived, the designated evidence reveals that there were "a lot of police cars, a lot of people." Id. He observed Darryl's moped and Darryl's body, which was covered by a blanket, at a distance of approximately twenty to twenty-five feet. Darryl's shoes, which he recognized immediately, were "sticking out from under the blanket." Id. at 33. Based on the shoes and the moped, Clifton "knew it had to be [Darryl]." Id. Clifton did not arrive in time to view certain witnesses move Clifton's body from against McCammack's vehicle and administer CPR. He testified in his deposition that he believed when he came upon the scene Darryl's moped "was right up by the front fender and front wheel, on the driver side" and was "against the car." Id. McCammack stated in her affidavit, not inconsistently with Clifton's testimony, that "[b]ystanders [] moved Mr. Clifton's moped away from [her] vehicle and laid it on the pavement a short distance away." Id. at 58. Photographs included in the designated evidence depict the scene, including Darryl with his body covered by a white sheet and the moped laid on its side at a distance of about a car length from McCammack's car, with the body between the car and the moped. Although Clifton never observed Darryl's body uncovered by the sheet, nor did he observe any blood or other injuries to Darryl, we find that based upon the designated evidence Clifton viewed the gruesome aftermath of Darryl's death, and accordingly his claim satisfies the temporal prong of the bystander rule's proximity requirement.

19

Second, the circumstantial prong requires the court to analyze the circumstances by which the claimant came upon the scene. These facts present the specific question of whether Clifton was "informed of the incident before coming upon the scene," Smith, 862 N.E.2d at 663, based on the news report he viewed and the inferences he made. As noted above, the news reported "a motorbike fatality in the 3300 block of Kentucky Avenue." Id. at 32. It did not report the name of the victim, nor did it include any photos or video footage of the crash scene. The news report gave Clifton a "very bad feeling" because he "knew Darryl had just left on his motorbike" and Kentucky Avenue was "the route he always took to go in town," and Clifton "definitely was upset." Id. Clifton then made the decision to leave his home to seek the location of the accident and to investigate if Darryl was involved in it.

Again, as noted in Smith, the policy underlying the bystander rule is to allow claims where the plaintiff sustains emotional injuries arising "from the shock of experiencing the traumatic event." 862 N.E.2d at 663. The Bowen Court deemed this line to be "necessary because witnessing such an incident was 'distinct' from learning of a victim's death or injury indirectly." Id. at 662 (quoting Bowen, 517 N.W.2d at 445). We find that although Clifton was worried that his son may have been involved in the crash and left his home based upon such concern, he did not have knowledge that Darryl was in fact the person involved in the accident prior to arriving at the scene. Upon learning that Darryl was the victim, Clifton informed an officer that he believed the victim was his son, the officer took Clifton to a nearby Arby's to talk, and at the Arby's Clifton kept repeating "Why? Why? Why?" Id. at 33. Thus, we find that Clifton

20

suffered emotional trauma from the "shock of experiencing the traumatic event" at the crash scene. Smith, 862 N.E.2d at 663. Cf. Johnson, 971 N.E.2d at 153-155, 161-162 (holding that plaintiff was not entitled to damages for negligent infliction of emotional distress where the plaintiff knew of his mother's death and left the apartment where they lived but later returned to the apartment, at which time he sustained his claimed emotional injuries under the bystander rule).

Finally, we find this court's decision in Ryan consistent with our conclusion that Clifton's claim satisfies the bystander rule. In Ryan, Tonia Ryan was pregnant with a baby fathered by her husband Kevin, and during her pregnancy her doctor, Dr. Brown, recorded her blood pressure at several of her appointments. 827 N.E.2d at 115. During her thirty-fourth week of pregnancy, Tonia phoned Dr. Brown's office to "report her concern about having noticed decreased fetal movement over the previous two days," and she and Kevin met with Dr. Brown later that day. Id. Dr. Brown diagnosed Tonia with preeclampsia, a pregnancy-related condition that causes high blood pressure and can affect an expecting mother's kidneys, liver, brain, and placenta, and can deprive a fetus of oxygen. Id. Tonia was admitted to the Decatur County Memorial Hospital, wherein a nursing assessment revealed various symptoms which "suggested the possibility of an impending placental abruption that could threaten the life of Tonia and Kevin's child, whom they had named Ray," but this information was not timely relayed to Dr. Brown. Id. A few hours later, an ultrasound was performed on Tonia which revealed that Ray had died in utero. Id. Kevin was called at work and asked to come to the hospital. When he arrived, Dr. Brown told him that Ray had died, and Kevin then informed Tonia of

21

Ray's death. Id. At the hospital, Ray was delivered stillborn by vacuum-assisted vaginal delivery, and afterwards both Tonia and Kevin had the opportunity to hold their son. Id. at 116. Tonia also required medical attention and was hospitalized for two days to stabilize her condition. Id. The Ryans filed a complaint for damages with the Indiana Department of Insurance, the panel held unanimously that Dr. Brown and the hospital failed to meet the applicable standard of care and that such conduct was a factor in the damages incurred by the Ryans, and the Ryans filed a complaint in the trial court, including claims for negligent infliction of emotional distress. Id. The trial court ultimately granted motions for summary judgment regarding the negligent infliction of emotional distress claims in favor of both Dr. Brown and the hospital. Id.

On appeal, this court reversed the trial court's grant of summary judgment regarding the Ryans' negligent infliction of emotional distress claims. Id. at 118, 124. Regarding Tonia, the court held that she "can satisfy Shuamber's modified impact rule."[5] Id. at 119. The court analyzed Kevin's negligent infliction of emotional distress claim under the bystander rule in which Dr. Brown and the hospital argued that he could not satisfy the rule "because he did not witness the death of a loved one." Id. at 122. The court held that Kevin satisfied the rule where he "came on the scene soon after Ray's death." Id. Dr. Brown and the hospital also argued that Kevin learned of Ray's death indirectly when Dr. Brown told him what had happened, but the court found that

---

[5] Involved in the court's discussion was whether Tonia's emotional distress damages should be limited to only the emotional damages she suffered as a result of her own injuries and not the emotional damages she felt due to Ray's injuries due to Ray's status as an unborn fetus. Ryan, 827 N.E.2d at 119-121. The court held that she may recover for all emotional damages that she suffered that are directly related to her miscarriage, including the emotional damages felt due to Ray's injuries. Id. at 121.

"[a]lthough Kevin did first learn of Ray's death from Dr. Brown, he also witnessed the gruesome aftermath of Ray's death," noting that "[a]fter Dr. Brown told Kevin that Ray had died, Kevin had to tell Tonia of their son's death. Kevin was present when Dr. Brown unsuccessfully tried to induce labor. Kevin was with Tonia as her physical condition began to deteriorate," and he "rode with Tonia in the ambulance as she was transferred to Methodist Hospital. Kevin was present when Ray was finally delivered and was given the opportunity to hold his dead son with his wife." Id. at 122-123. The court held that Kevin could satisfy the bystander rule and was entitled to pursue a claim for negligent infliction of emotional distress. Id. at 123.

As in Ryan, here Clifton came on the scene soon after Darryl's death. He witnessed the crash scene including his son's body lying in the street covered by a sheet. Regarding the manner in which he learned of Darryl's death, Clifton possessed even less knowledge than Kevin Ryan possessed in that, although Kevin learned of his child's death from Dr. Brown prior to joining his wife in the hospital room, Clifton could only speculate as to whether Darryl was the person who was involved in the fatal accident. As in Ryan, "[w]e are satisfied that the evidence designated to the trial court here is such that the alleged emotional distress suffered by [Clifton] is not likely speculative, exaggerated, fictitious, or unforeseeable." Id. at 124. We therefore conclude that the trial court erred in granting McCammack's motion for summary judgment and denying Clifton's motion because Clifton's claim satisfies the bystander rule and because he has alleged serious emotional trauma that is of a kind and extent normally expected to occur in a reasonable person under similar circumstances.

23

CONCLUSION

For the foregoing reasons, we reverse the trial court's grant of summary judgment in favor of McCammack, grant summary judgment in favor of Clifton, and remand for a trial on damages.

Reversed and remanded.

BAILEY, J., and MAY, J., concur.