ATTORNEY FOR APPELLANT
James A. Mellowitz
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
W. Brent Threlkeld
Kelly A. Roth
Threlkeld & Associates
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 49S02-1504-CT-228

FILED
Sep 21 2015, 11:21 am
CLERK
of the supreme court,
court of appeals and
tax court

RAY CLIFTON,

*Appellant (Plaintiff),*

v.

RUBY MCCAMMACK,

*Appellee (Defendant).*

Appeal from the Marion Superior Court, No. 49D07-1305-CT-022085
The Honorable Michael D. Keele, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1404-CT-276

**September 21, 2015**

**Rush, Chief Justice.**

In Indiana, there are two rules under which a person can recover for negligent infliction of emotional distress. One of these—the bystander rule—requires, in part, that the person claiming emotional trauma meet certain "circumstantial" factors, which this Court has previously held are questions of law. Specifically, under our precedent, the claimant must demonstrate that the scene viewed was essentially as it was at the time of the incident, that the victim was in essentially the same condition as immediately following the incident, and that the claimant was not informed of the incident before coming upon the scene. Meeting these factors ensures that the claimant can establish sufficient "direct involvement" with the incident to permit emotional distress recovery.

Here, after watching a news story about a fatal car crash, a father drove to the scene of the accident, fearing his son was involved. By the time he arrived, the unsuccessful resuscitation efforts had ended, and the son's body had been moved and covered with a white sheet so that no signs of injury were visible. Given these undisputed facts, we hold, in accordance with Smith v. Toney, 862 N.E.2d 656 (Ind. 2007), that as a matter of law, the father cannot recover for negligent infliction of emotional distress—despite his undoubtedly genuine grief and shock—because none of the three circumstantial factors were met. Accordingly, we affirm summary judgment in favor of the negligent driver.

## Facts and Procedural History

Ray Clifton ("Clifton") and his son Darryl Clifton ("Darryl") lived together and were very close. Darryl helped take care of his father. On August 3, 2012, fifty-one-year-old Darryl left home on his moped at approximately 11:15 a.m. Shortly after, around 11:28 a.m., Ruby McCammack negligently turned left in front of Darryl, who struck McCammack's car and suffered fatal injuries.

Immediately after the impact, Darryl was still on his moped. Witnesses then lifted Darryl and laid him on the pavement. Darryl had severe bleeding from his head and also suffered from face, neck, and back trauma. Resuscitation efforts were ultimately unsuccessful, and Darryl was pronounced dead at 11:43 a.m.

At the time of the collision, Clifton was home watching television. When the 12:00 p.m. news aired, he saw that a fatal accident involving a moped had occurred on the 3300 block of Kentucky Avenue. Clifton feared that the person involved in the collision was Darryl. He had a "very bad feeling" and "definitely was upset." Although he was not sure, Clifton "figured" Darryl was going to Indianapolis and knew Kentucky Avenue was "the route he always took" to get there. The news segment, however, did not provide any pictures or video of the accident or details about the victim.

Clifton quickly got into his car and drove to the scene, which was about four miles from his home. It took him six or seven minutes to get there, and Clifton "pray[ed] all the way" that the victim was not Darryl. When he arrived, he saw a lot of police cars and people, and he pulled into a nearby gas station. From a distance of twenty or twenty-five feet, he also saw Darryl's moped

2

near the front wheel of McCammack's car and a body on the ground covered with a white sheet. Clifton never approached the body and could not see any blood or physical signs of injury, but he recognized the shoes sticking out from under the sheet—they were Darryl's.

Clifton immediately talked to an officer, who took Clifton to a nearby restaurant. There, police confirmed that the victim was, in fact, Darryl. Clifton kept repeating, "Why? Why? Why?" A couple hours later, Clifton's minister and the minister's wife took Clifton home. Clifton did not see the removal of Darryl's body, and when Clifton left, the scene had been completely cleaned. After the accident, Clifton had to undergo counseling and was prescribed antidepressant medication.

In May 2013, he sued McCammack for negligent infliction of emotional distress. McCammack admitted negligently causing Darryl's death, but she ultimately moved for summary judgment, arguing that Clifton could not meet certain requirements that would permit recovery for his emotional distress. Clifton opposed summary judgment and filed his own cross-motion.

After a hearing, the trial court granted summary judgment to McCammack, finding that "the undisputed facts established [that Clifton] fails to meet the temporal and circumstantial requirements to permit recovery for negligent infliction of emotion[al] distress as set forth in Smith v. Toney, 862 N.E.2d 656 (Ind. 2007)."

Clifton appealed, and the Court of Appeals reversed the trial court, entering summary judgment for Clifton and remanding for a trial on the question of damages. Clifton v. McCammack, 20 N.E.3d 589, 602 (Ind. Ct. App. 2014). We granted transfer, thereby vacating the Court of Appeals decision. Ind. Appellate Rule 58(A).

**Standard of Review**

This Court reviews a trial court's order granting summary judgment de novo. Alldredge v. Good Samaritan Home, Inc., 9 N.E.3d 1257, 1259 (Ind. 2014). The standard is the same on appeal as in the trial court: summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Jackson v. Scheible, 902 N.E.2d 807, 809 (Ind. 2009). Where there are cross-motions for summary judgment, each must be considered separately. Asklar v. Gilb, 9 N.E.3d 165, 167 (Ind. 2014).

**Discussion and Decision**

Our "bystander rule"—a fairly recent development in Indiana law—allows recovery for negligent infliction of emotional distress if a claimant can establish sufficient "direct involvement" with the incident. "Direct involvement" involves certain temporal and circumstantial factors. The temporal factor requires that the claimant be at the scene of the incident when it occurs or arrive soon after; the circumstantial factors require both the scene and victim to be in the same condition as immediately following the incident and the claimant to have not been informed of the incident before coming upon the scene. Without these requirements, an emotional distress claim fails as a matter of law.

Although the present case deals with a fairly straightforward application of this Court's precedent, it is set against a backdrop of complex and sensitive policy issues. Examining the history of the "bystander rule" and inquiring whether our precedent is in need of reconsideration are necessary steps to aid us in reaching our decision today.

## I. The Evolution of Indiana's "Bystander Rule" Is Relevant to Our Analysis Today.

For years, "Indiana ha[d] a long-standing and well-established rule that damages for mental distress or emotional trauma may be recovered only when the distress is accompanied by *and* results from a physical injury caused by an impact to the person seeking recovery." Shuamber v. Henderson, 579 N.E.2d 452, 454 (Ind. 1991) (alteration in original). Known as the "impact rule," this standard required that the mental injury be the direct and natural result of the plaintiff's physical injury. Id.

This Court later expanded the "impact rule" into what is currently known as the "modified impact rule." In Shuamber, a mother and daughter sought emotional distress damages after they were involved in an automobile collision in which their immediate family member died. Id. at 453. Their claim for damages was not based on trauma arising out of their own physical injuries but rather based on trauma imposed on them as a result of observing mortal injuries to another person. Id. at 454.

We noted that under the "impact rule," the mother and daughter were precluded recovery for their mental injuries, given that their trauma did not stem from their own physical injuries. Id.

4

at 455. But this Court "perceive[d] no reason under appropriate circumstances to refrain from extending recovery for emotional distress to instances where the distress is the result of a physical injury negligently inflicted on another." Id. We held,

> When . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement[,] sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, . . . such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

Id. at 456. In other words, the "modified impact rule" does not compel an emotionally traumatized party to demonstrate a contemporaneous physical *injury*, but it maintains the requirement that a direct physical *impact* occur. Atl. Coast Airlines v. Cook, 857 N.E.2d 989, 996 (Ind. 2006). Essentially, the broader "modified impact rule" subsumed the former "impact rule," as parties who can prove the "impact rule" elements will necessarily meet the criteria to satisfy the "modified impact rule."

Later, in Groves v. Taylor, this Court was faced with facts that did not squarely fit within the "modified impact rule." 729 N.E.2d 569 (Ind. 2000). A sister heard a loud "pop" and turned around to see her brother's body rolling off of a highway as the result of being struck by a vehicle. Id. at 571. The brother suffered fatal injuries, and the sister claimed emotional distress as a result of witnessing the negligent accident that killed her brother. Id.

We noted that it was "undisputed" that the sister did not suffer the type of direct impact contemplated under the "modified impact rule." Id. at 572. This Court explained that the value of requiring such a direct impact is the "clear and unambiguous evidence that the plaintiff was so directly involved in the incident giving rise to the emotional trauma that it is unlikely that the claim is merely spurious." Id. But this Court also recognized that there existed "circumstances where, while the plaintiff does not sustain a direct impact, the plaintiff is sufficiently *directly involved* in the incident giving rise to the emotional trauma that we are able to distinguish legitimate claims from the mere spurious." Id. (emphasis added).

Relying on persuasive reasoning from another jurisdiction, this Court noted that, in cases not involving a direct impact, concerns of spurious claims and open-ended liability were alleviated if three specific factors were present. Id. (citing Bowen v. Lumbermens Mut. Cas. Co., 517 N.W.2d 432 (Wis. 1994)). First, a fatal or serious injury can be expected to cause severe distress, while

less serious harm to a victim would not. Id. at 572–73. Second, although seeing the death or injury of a friend or acquaintance is distressful, seeing the death or injury of a close relative is uniquely compelling to warrant compensation. Id. at 573. And, finally, witnessing the incident "'or the gruesome aftermath of such an event minutes after it occurs is an extraordinary experience, distinct from the experience of learning of a' loved one's death or severe injury by indirect means." Id. (quoting Bowen, 517 N.W.2d at 444–45).

We synthesized these factors into what is now known as the "bystander rule" and held that where the modified impact test is not met,

> a bystander may nevertheless establish "direct involvement" by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise tortuous [sic] conduct.

Id.

This Court then elaborated on the "bystander rule" in Smith v. Toney, 862 N.E.2d 656 (Ind. 2007), in response to two certified questions from the United States District Court for the Southern District of Indiana. First, are the bystander rule's requirement of relationship between the parties and requirement of plaintiff's proximity to the scene questions of fact, law, or mixed questions of law and fact? Id. at 657. Second, if issues of law, is a fiancée an "analogous" relationship under Groves and is "soon after the death of a loved one" a matter of time alone or also of circumstances? Smith, 862 N.E.2d at 657.

We determined that the relationship and proximity determinations—*i.e.*, what constitutes an analogous relationship and what satisfies "soon after the death of a loved one"—are questions of law, which we believed was "consistent with the basic concerns that have historically limited recovery for negligent infliction of emotional distress," including spurious claims and open-ended liability. Id. at 660. We drew this conclusion after examining Bowen—the case on which this Court primarily relied when crafting the Groves "bystander rule": "The Bowen court pointed out that public policy considerations were 'an aspect of legal cause' and that the '*application* of public policy considerations is a function *solely* of the court.'" Id. at 659 (first emphasis added) (quoting

6

Bowen, 517 N.W.2d at 443). And because the relationship and proximity criteria were "derived from the public policy considerations that underlie and define a claim for negligent infliction of emotional distress," they were issues of law for courts to resolve. Id. at 660. We finally stressed that "[r]ules of law are designed to promote consistency and predictability." Id.

We then determined that a fiancée was not "analogous to a spouse" as contemplated in Groves. Smith, 862 N.E.2d at 660. And, further, we held that the requirement that a plaintiff come on the scene "soon after the death of a loved one"—the proximity requirement—involves both time and circumstances:

> [T]he requirement of bystander recovery is both temporal—at or immediately following the incident—and also circumstantial. The scene viewed by the claimant must be essentially as it was at the time of the incident, the victim must be in essentially the same condition as immediately following the incident, and the claimant must not have been informed of the incident before coming upon the scene.

Id. at 663. In parsing out these temporal and circumstantial factors, we stressed that emotional distress recovery was "limited to those that arise from the shock of experiencing the traumatic event," in order to place reasonable limits on a defendant's liability and to ensure that claims are genuine. Id. And we further noted that witnessing an incident was different from learning of a relative's death or injury indirectly—in other words, "emotional trauma arising from learning of a loved one's death through indirect means could be devastating but . . . every person could be expected at some point to learn of the death or serious injury of a loved one through indirect means." Id.

Importantly, in Smith, we pointed out the importance of "bright line rules" for this tort, since otherwise "there is virtually no limit to the number of potential claimants." Id. at 662. And while we recognized that placing certain limits could be viewed as arbitrary, we observed that some "arbitrariness is necessary in setting the outer limits of tort liability in general and in setting the outer limits of liability in the field of emotional distress in particular." Id. (quoting Dunphy v. Gregor, 642 A.2d 372, 381 (N.J. 1994) (Garibaldi, J., dissenting)).[1]

---

[1] Although this discussion occurred in the context of whether a fiancée should be considered analogous to a spouse, the language is equally relevant to the limits we set on the proximity component of the bystander rule.

## II. We Perceive No Need to Expand Indiana's Rule on Bystander Recovery for Negligent Infliction of Emotional Distress.

Our research has revealed that jurisdictions across the country apply markedly divergent tests to permit recovery for negligent infliction of emotional distress. See, e.g., Cobert v. Moomba Sports, Inc., 176 P.3d 497, 500 (Wash. 2008) (noting that "other courts have applied numerous, widely varying standards for determining whether and when a defendant will be liable for negligent infliction of emotional distress"); Dale Joseph Gilsinger, Annotation, Immediacy of Observation of Injury as Affecting Right to Recover Damages for Shock or Mental Anguish from Witnessing Injury to Another, 99 A.L.R.5th 301 (2002). Several jurisdictions, for example, disallow recovery for negligent infliction of emotional distress due to witnessing a negligent injury to another unless the claimant was in the zone of physical danger created by the defendant's tortious conduct. E.g., Rickey v. Chi. Transit Auth., 457 N.E.2d 1, 5 (Ill. 1983). Other jurisdictions, like Indiana, that have a more expansive approach to bystander recovery, still diverge—some courts employ a foreseeability analysis, whereas others condition recovery on the satisfaction of concrete factors. Compare, e.g., Crippens v. Sav On Drug Stores, 961 P.2d 761, 763 (Nev. 1998), with, e.g., Thing v. La Chusa, 771 P.2d 814, 829–30 (Cal. 1989). And the variances do not end there. Jurisdictions differ when considering the immediacy of a claimant's observation of the incident as a part of their bystander tests—for example, some courts require that a bystander be at the location of the injury-causing event when it occurs, while other courts have permitted bystander recovery when the claimant arrives at the site after the injury-causing event occurs. Compare, e.g., Fineran v. Pickett, 465 N.W.2d 662, 664 (Iowa 1991), with, e.g., Stump v. Ashland, Inc., 499 S.E.2d 41, 49 (W. Va. 1997).

Ultimately, after examining other jurisdictions' approaches, we conclude that we should not change or further expand our precedent. Bystander claims often present fact patterns involving close relatives and horrific injuries, and we recognize that under certain circumstances, bright-line rules may disallow recovery for genuine emotional trauma. Thus, employing a less restrictive foreseeability approach that would expand recovery for those who suffer such distress would initially appear desirable. But we believe this approach is fraught with problems:

> [R]eliance on foreseeability of injury . . . is not adequate when the damages sought
> are for an intangible injury. In order to avoid limitless liability out of all proportion
> to the degree of a defendant's negligence, and against which it is impossible to

insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited.

Thing, 771 P.2d at 826–27.

In our view, the requirements we have crafted to pursue a successful bystander claim—and making those requirements questions of law—appropriately address the various public policy concerns this particular tort implicates. In other words, we believe that Indiana's bystander rule strikes the appropriate balance between allowing authentic claims to proceed while also curbing the real issues of open-ended liability, fraudulent claims, and the ubiquity of this type of injury. Over the years, this Court has expanded the class of persons who may seek emotional distress recovery, but any further expansion would be too likely to raise the amalgam of policy problems we seek to avoid.

Adhering to the bystander rule as established by our precedent serves another important purpose. The doctrine of stare decisis is a "maxim of judicial restraint supported by compelling policy reasons of predictability." Snyder v. King, 958 N.E.2d 764, 776 (Ind. 2011). And under this doctrine, "a rule which has been deliberately declared should not be disturbed by the same court absent urgent reasons and a clear manifestation of error." Id. (quoting Marsillett v. State, 495 N.E.2d 699, 704–05 (Ind. 1986)). Accordingly, Groves and Smith remain good law.

### III. As a Matter of Law, Clifton Did Not Meet the Bystander Rule's Three Circumstantial Factors.

On direct appeal, Clifton argued that he satisfied Smith's temporal and circumstantial requirements.[2] He contended that he arrived minutes after the incident, that Darryl's body and the accident scene had been unchanged before he saw them, and that it was undisputed that he did not know that Darryl had been killed in the crash prior to arriving.

After noting Smith's holding that the temporal and circumstantial requirements were questions of law, the Court of Appeals pinpointed the relevant question as "whether the circumstances surrounding Clifton's coming on the scene of Darryl's death satisfies the proximity

---

[2] Clifton also argued that Smith's explanation of the bystander rule's temporal and circumstantial requirements was merely dicta, but the Court of Appeals correctly disagreed. Clifton, 20 N.E.3d at 598.

requirement of the bystander rule." Clifton, 20 N.E.3d at 598–99. While that is indeed the relevant question, we reach a different answer.

The Court of Appeals first determined that Clifton's arrival to the scene forty minutes after the accident and twenty-five minutes after Darryl's death satisfied the temporal prong of the bystander rule. Id. at 599. In terms of the first two circumstantial factors[3]—the scene of the accident and the condition of Darryl when Clifton arrived—the Court of Appeals recognized that Clifton did not see witnesses move Darryl's body, did not observe the unsuccessful resuscitation efforts, and did not see any blood or physical injuries to the body. Id. at 599–600. But the court noted that Clifton saw a lot of police cars and people and saw Darryl's body covered with a white sheet and concluded, based on those facts, that Clifton "viewed the gruesome aftermath of Darryl's death." Id. at 600. As to the last circumstantial factor—whether Clifton had been informed of the incident before coming upon the scene—the Court of Appeals noted that as a result of watching the news, Clifton "made the decision to leave his home to seek the location of the accident and to investigate if Darryl was involved in it." Id. But the court found that although Clifton was worried that Darryl was the victim, Clifton "did not have knowledge that Darryl was in fact the person involved in the accident prior to arriving at the scene." Id. And soon after Clifton learned Darryl was the victim, he repeated "Why? Why? Why?"—which the Court of Appeals determined was emotional trauma resulting from the "shock of experiencing the traumatic event." Id. (quoting Smith, 862 N.E.2d at 663).

On transfer, McCammack argues that Clifton failed to satisfy the bystander rule as set forth in Groves and elaborated on in Smith, focusing her arguments on the three circumstantial components. Specifically, she contends that Clifton never witnessed the "gruesome aftermath" of the accident because Clifton never observed any injury, blood, or resuscitation efforts and never

---

[3] We note that the Court of Appeals referred to the state of the accident scene and the condition of Darryl's body as temporal factors. Clifton, 20 N.E.3d at 599–600. We believe, however, that these are properly classified as circumstantial factors. Smith was clear that the proximity prong of the bystander rule had one temporal component—"at or immediately following the incident"—and three circumstantial components. 862 N.E.2d at 663. The circumstantial components deal with the state of the scene, the state of the victim's body, and whether the claimant was informed of the incident before coming upon the scene. Id. Of course, the Smith temporal and circumstantial factors are closely interwoven, because the circumstances surrounding an accident—for example, whether there were significant changes to the victim's body or the scene—will likely change with the passage of time.

10

saw Darryl's body uncovered by the white sheet. McCammack also argues that Clifton was informed of the incident before coming upon the scene because he learned of the accident through the news and voluntarily went to the scene out of concern for his son. She asserts that <u>Smith</u> requires a level of fortuity—in other words, a claimant has to arrive to the incident by chance—and that <u>Smith</u> precludes recovery if a claimant's emotional distress begins prior to the chance encounter. She maintains that the undisputed facts bar Clifton's recovery for emotional trauma and that to decide otherwise would lead to defendants facing unlimited exposure from victims' relatives. We address each argument in turn.

### A. Neither the Victim Nor the Scene Was Essentially the Same When Clifton Arrived.

To recover for emotional distress under a bystander theory, a claimant has to view a scene that is "essentially as it was at the time of the incident" with "the victim . . . in essentially the same condition as immediately following the incident." <u>Smith</u>, 862 N.E.2d at 663. Unless these factors are satisfied, a claimant will not have witnessed the "gruesome aftermath"—a term that was repeated throughout the <u>Groves</u> and <u>Smith</u> decisions.

We understand "gruesome aftermath" as referring to an "uninterrupted flow of events following closely on the heels of the accident." <u>Smith</u>, 862 N.E.2d at 662 n.3 (quoting <u>Beck v. Dep't of Transp. & Pub. Facilities</u>, 837 P.2d 105, 110 (Alaska 1992)). When a bystander witnesses this "uninterrupted flow of events," he or she is essentially subjected to a "sudden sensory observation" of the incident itself. <u>Id.</u> (quoting <u>Beck</u>, 837 P.2d at 110). Without this type of observation, claimants cannot establish the "direct involvement" necessary to recover for bystander emotional trauma, and "direct involvement" is the key principle that has guided the evolution of the bystander rule from the outset. <u>See id.</u> at 659; <u>Groves</u>, 729 N.E.2d at 573.

Here, the facts reveal that both the scene and Darryl's body were materially changed before Clifton arrived. Witnesses moved Darryl's body, which was upright on his motorbike after the collision, and laid him flat on the pavement. And, after resuscitation efforts failed, emergency personnel covered the body so that no signs of trauma were visible. Although Clifton may have arrived to the scene in a fairly short amount of time after Darryl's death, Clifton did not experience the "uninterrupted flow of events" following the collision, *i.e.*, before there were significant changes to both the scene and Darryl's body. Or, to state it another way, Clifton did not have the

11

sudden sensory experience necessary to establish direct involvement. Accordingly, in line with our precedent, as a matter of law, Clifton did not view the "gruesome aftermath" of the incident.

This is not to trivialize emotional trauma that occurs after either the scene or a victim's condition has materially changed. As demonstrated by this particular case, genuine emotional distress can certainly occur even after the "gruesome aftermath" of an accident has passed. But the important policy reasons undergirding our bystander test are key considerations, and so we have drawn parameters in defining who may recover. When we decided both Groves and Smith, we were well aware that emotional trauma would still befall an immediate family member who arrived to an accident scene after the victim or scene had materially changed. But to curb the issues of open-ended liability and the ubiquity of this type of injury, we had to strike a balance and establish boundaries. As we stressed in Smith: "'Bystander' claims are not meant to compensate every emotional trauma." 862 N.E.2d at 663. "Rather they are limited to those that arise from the shock of *experiencing* the traumatic event." Id. (emphasis added).

### B. Clifton Had Learned Indirectly of the Incident Before Arriving.

To recover for bystander emotional distress, the third circumstantial factor requires that "the claimant must not have been informed of the incident before coming upon the scene." Id. This requirement necessarily precludes recovery for emotional trauma that arises when a claimant learns of such an incident "through indirect means." Id. at 662–63.

This circumstantial factor involves a degree of fortuity: it requires a bystander to arrive to an incident unwittingly and bars claims where bystanders knowingly and willingly expose themselves to the scene of an accident. The trigger for the emotional distress must not be some prior knowledge of the incident before arriving to the scene, but rather the happenstance contemporaneous or near-contemporaneous sensory experience of the incident itself. To put it another way, the compensable emotional trauma must be unmediated, and there should be no period of time during which a bystander can brace himself or herself.

In the present case, Clifton was informed of the incident before arriving to the crash scene. When the 12:00 news aired, Clifton learned of a fatal motorbike accident that occurred along a route that Darryl frequented. Although Clifton was not sure the victim was Darryl, as the news did not provide details, Clifton "had a very bad feeling" that prompted him to voluntarily drive to the

scene. Of course, this emotional trauma escalated when Clifton's worst fears were eventually confirmed—that Darryl was, in fact, the crash victim. But it is undisputed that Clifton's emotional distress began as he was watching television—and emotional trauma triggered by a news story of an accident is distinct from sudden shock that arises when one unwittingly comes upon a scene of an accident. Thus, as a matter of law, Clifton was informed of the incident indirectly before his arrival to the crash site.[4]

Again, we must stress that major public policy concerns dictate that we draw bright lines, especially in terms of this particular tort. To allow a claimant to recover under a bystander theory when his or her emotional distress begins as a result of seeing a news story or the like would result in virtually limitless litigation. Our quickly evolving state of social media and instantaneous news coverage further underscores the importance of setting parameters for this tort. We are at a point in time when people are often subjected to seeing live, streaming footage—on high-definition televisions, smart phones, or other devices—of emergencies possibly involving their immediate beloved relatives. There must be a point at which a defendant's exposure to liability for negligent infliction of emotional distress ends—not to diminish real anguish, but simply because pragmatism demands that the line be drawn somewhere. And our precedent has drawn that line by setting out straightforward limits for recovery under this tort.

---

[4] At this point, we must address two decisions that pre-date Smith v. Toney. In the present case, the Court of Appeals relied on Ryan v. Brown, 827 N.E.2d 112 (Ind. Ct. App. 2005), in reaching its conclusion that Clifton did not learn of the incident by indirect means. Clifton, 20 N.E.3d at 600–02. In Ryan, a doctor informed a father that his son had died in utero; the father later witnessed the delivery of his stillborn son. 827 N.E.2d at 115–16. The father was allowed to pursue a claim for negligent infliction of emotional distress based on a bystander theory, despite having learned of his son's death through another person. Id. at 122–25. We find this conclusion from Ryan in conflict with the bystander test as laid out in Groves and further clarified by Smith. Accordingly, we disapprove of Ryan to the extent that it holds a person may recover under a bystander theory for negligent infliction of emotional distress despite learning of a loved one's death or severe injury through indirect means.

Further, we observe that Ryan relied on Blackwell v. Dykes Funeral Homes, Inc., 771 N.E.2d 692, 697 (Ind. Ct. App. 2002). In Blackwell, a son's cremated remains were lost, and the parents sued for negligent infliction of emotional distress as relative bystanders. Id. at 694. The Blackwell court noted that the Groves "tripartite test [was] . . . inapposite here" but nonetheless allowed the parents' claim to proceed because it was not "likely speculative, exaggerated, fictitious, or unforeseeable." Id. at 697. Although Groves discussed the importance of distinguishing legitimate claims from merely spurious ones, it also established a test with specific requirements that must be met before a person can successfully assert a bystander claim. To the extent that Blackwell holds that a person need not meet these requirements, it is also disapproved.

## Conclusion

The undisputed facts demonstrate that Clifton did not meet the circumstantial factors under the bystander test—both the scene and victim were significantly changed before he arrived at the accident, and he had also been informed of the incident indirectly before coming upon it. Accordingly, as a matter of law, Clifton is unable to recover emotional distress damages, and McCammack is entitled to summary judgment.

We affirm the trial court.

Dickson, Rucker, David, and Massa, JJ., concur.